# Illinois Official Reports

## Appellate Court

---

### *People v. Lee*, 2019 IL App (1st) 162563

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BILL LEE, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-16-2563 |
| Filed | February 27, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-11997; the Hon. Matthew E. Coghlan, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | DePaul University Legal Clinic, of Chicago (Maria A. Harrigan, of counsel, and Elin Shoback, Kathleen McStay, and Elena Morgan, law students), for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Brian A. Levitsky, Assistant State's Attorneys, of counsel), for the People. |

Panel                    JUSTICE HOWSE delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith concurred in the judgment and
opinion.
Justice Ellis specially concurred, with opinion.

**OPINION**

¶ 1     Following a jury trial, the circuit court of Cook County convicted defendant, Bill Lee, of defacing identification marks of a firearm, aggravated unlawful use of a weapon (AUUW) based on not having a currently valid license under the Firearm Concealed Carry Act (430 ILCS 66/1 *et seq.* (West 2016)), and aggravated unlawful use of a weapon based on not having a currently valid firearm owner's identification card. At defendant's trial, the court instructed the jury that the State was required to prove that defendant knowingly possessed the firearm. Over defendant's objection, the court further instructed the jury that the State was not required to prove defendant had knowledge of the defaced serial number. On appeal, defendant argues that the State did not provide sufficient evidence to prove beyond a reasonable doubt that defendant knowingly possessed a firearm with a defaced serial number and the trial court erred when it failed to instruct the jury that the State was required to prove defendant knew the firearm's serial number was defaced. Alternatively, defendant argues that he was deprived of a fair trial when the court answered a question from the jury and when the State introduced prejudicial testimony into evidence. For the reasons that follow we reverse the judgment of the trial court and remand for a new trial.

¶ 2                                    I. BACKGROUND
¶ 3     The State indicted defendant for the offense of defacing identification marks of a firearm and two counts of AUUW. Prior to trial, defendant filed a motion *in limine* to prevent any reference to defendant being involved in a gang or gang activity, which the State did not object to. Defendant's motion also sought to preclude any reference to the location of defendant's arrest being a high-crime area. The trial court allowed the State to elicit evidence that officers were in the location of defendant's arrest to investigate drug sales, but not to offer a blanket statement that it was a high-crime area. After opening arguments, the State presented its case-in-chief.

¶ 4                            A. Testimony of Officer Ricky Hughes
¶ 5     Officer Ricky Hughes testified that he was conducting surveillance for a controlled drug buy on the morning of June 15, 2014. Officer Hughes was working with a supervisor, five additional surveillance officers, and two officers working enforcement. While conducting surveillance, Officer Hughes saw a black Toyota Camry with tinted windows repeatedly drive down the block, past a McDonald's restaurant, without parking. Officer Hughes wrote down the license plate number of the Camry and saw the same vehicle pass him three times driving in the same manner of slowing to a near stop in the middle of the block, continuing southbound, and turning westbound. Officer Hughes radioed his partners to inform them that the black Camry was driving suspiciously. The fourth time the Camry passed by, Officer Hughes saw that it was followed by a tan Ford 500, and he decided to leave his fixed surveillance and

follow the vehicles. After the cars turned westbound, the rear passenger window of the Camry lowered, and a passenger put an arm out of the window and pointed to an area by the curb. The Ford pulled over and parked where the arm pointed. The Camry continued westbound and Officer Hughes followed, passing the parked Ford. Officer Hughes's partners communicated to him on the radio that they were set up watching the tan Ford. Eventually, the Camry returned to where the Ford was parked and pulled up alongside it. After a few minutes, the Camry continued driving, and the Ford followed behind. Officer Hughes followed the cars for about one mile and radioed his team members so that they could maintain mobile surveillance. After a mile or so, Officer Hughes stopped following, and another officer radioed that he was following the Camry and Ford. When the Camry and Ford stopped, the officers set up fixed surveillance of the vehicles. Officer Hughes heard over the radio that some men exited the vehicles and two of the men removed handguns from the trunk, and he began driving toward the parked cars. He saw two individuals running and followed them in his car. After turning into an alley and exiting the vehicle, Officer Hughes saw the individuals jump a fence and run back toward the parked cars. Officer Hughes radioed his team members that the men were running back to the parked cars. Officer Hughes returned to his vehicle to put on his bulletproof vest when he saw defendant and another person running toward him in the alley. Officer Hughes drew his weapon and ordered them to stop, and they complied. Officer Hughes testified that defendant was wearing a white baseball shirt with blue sleeves. On cross-examination, Officer Hughes testified that he first observed defendant when defendant was running toward him in the alley and that he had not seen defendant in either vehicle. Officer Hughes did not recover any weapons from defendant and did not see either the Camry or the Ford make any traffic violations.

¶ 6                                  B. Testimony of Officer Mike Heinzel

¶ 7        On the morning of June 15, 2014, Officer Mike Heinzel was working as an enforcement officer on a team conducting a narcotics investigation. Officer Heinzel was in an unmarked squad car, wearing a marked police vest. He heard on the radio that Officer Hughes was following a black Toyota Camry and tan Ford sedan, and he followed a short distance behind for security. Eventually Officer Heinzel heard on the radio that two men put guns in their waistbands, and he drove to where the Camry and Ford were parked. Several men were standing near the parked vehicles. As Officer Heinzel arrived and opened his door, the men immediately ran away. Officer Heinzel saw defendant run away and lost sight of defendant until defendant came back over a gate near where the vehicles were parked. Defendant and another man were 25 feet away from Officer Heinzel when he saw them exit the gangway. Officer Heinzel had a full frontal view of defendant as defendant exited the gangway. Defendant was wearing a white baseball shirt with blue sleeves, though Officer Heinzel could not remember what kind of pants defendant was wearing. Defendant had a gun in his hand when he came out of the gangway and saw the officers before he dropped the gun to his left and ran away from the officers. The man with defendant also came to the gate at the gangway, hopped the gate, and threw a gun over the gate. Officer Heinzel then went to retrieve the guns while his partner, Officer Goins, gave chase.

¶ 8        Officer Heinzel saw a small black revolver where he witnessed defendant toss a gun and a silver handgun on the other side of a chain-link fence gate. Officer Santiago arrived on the scene, and she recovered the black revolver while Officer Heinzel recovered the silver

handgun. Officer Santiago handed the black revolver to Officer Heinzel, who inspected the weapon and unloaded it. He discovered both guns had been loaded with five live rounds each. Officer Heinzel then put the guns in separate pockets and the ammo from each gun in separate pockets as well. He inventoried them when he arrived at the police station later. When inventorying the weapons, Officer Heinzel saw that the serial number was damaged on both guns.

¶ 9                     C. Testimony of Officer Joseph Serio

¶ 10        Officer Joseph Serio testified that he is an evidence technician working in the Chicago Police Department firearms laboratory. Officer Serio inspected the black revolver recovered by Officer Heinzel. Officer Serio testified that the revolver was a .38 special Smith and Wesson model 37-2 with five live cartridges. The revolver had scratches and marks along the serial number at the butt of the weapon "consistent with an attempt to obliterate the serial number using some type of small punch or hand tool." Officer Serio was able to fully read the serial number on the weapon after he cleaned the revolver and used a piece of fine sand paper to remove the debris caused by the scratches. On cross-examination Officer Serio testified that it is possible for a handgun to receive abrasions and scratches on the serial number through normal wear and tear, but that the markings on this revolver were not consistent with general wear and tear. The markings appeared to be intentional.

¶ 11        Officer Serio testified there were two kinds of ammunition recovered with the revolver: three full metal jacket bullets and two hollow point bullets. Officer Serio was asked "What is a hollow point bullet?" He testified a "hollow point is designed to expand on contact with its target. *** It's designed to potentially do more damage to the target. They're also used for law enforcement purposes in aircraft type situations where they do not want to penetrate completely their target." The prosecutor asked Officer Serio to show the two types of bullets to the jury "so they can see the difference." Officer Serio stated: "Hollow points, it's hollowed on the inside when it—it's hollow in the center and when it hits the target, it opens up." The prosecutor asked Officer Serio to "describe for the ladies and gentlemen of the jury what that bullet looks like once it's opened up?" Officer Serio responded to that question as follows: "Similar to a mushroom or a flower depending on the target it hits, they'll be—normally they're some sharp edges. It's designed to do more damage to its target." The prosecutor asked Officer Serio to "compare the circumference of the hollow point bullets once it opens up to something?" He testified: "The .38 Special is consistent probably with a size of a nickel when it opens up but it's not going to be consistently round. It's going to open up. There's going to be fragments because they're sharp edge." The prosecutor asked for a moment, and when questioning resumed, Officer Serio was asked what a full metal jacket bullet does when it hits its target. Officer Serio testified the full metal jacket generally stays intact and does not expand. The defense did not object to any of the questions or answers during the State's direct examination of Officer Serio.

¶ 12        On cross-examination, Officer Serio testified that he did not know what caused the abrasions on the serial number or how long those abrasions had been there. The weapon had been produced from approximately 1994 to 2006. He testified that it was possible the marks on the firearm could have been made by normal wear and tear, although it was his opinion that the damage was caused by some type of small tool.

### D. Testimony of Officer Ducar

Officer Ducar testified that, on the morning of June 15, 2014, he was working as a surveillance officer for the narcotics division with a team of officers. Based on information he received from Officer Hughes, Officer Ducar began mobile surveillance of a tan Ford 500. Officer Ducar was in plainclothes in a covert vehicle with nothing to identify him as a Chicago police officer. After following the Ford, he saw it park across from a black Toyota Camry. Two people exited the Ford and three people exited the Camry. As the people exited the Camry, the trunk of the car popped open. Officer Ducar testified that he was parked about 75 feet away when he saw defendant exit the driver's seat of the Camry and walk toward the trunk of the car. He saw defendant reach into the trunk, remove a black firearm, and place the firearm in his waistband. Another man reached into the trunk and pulled out a silver handgun. Officer Ducar could not see inside the trunk of the Camry from his vantage point. When Officer Ducar saw his team members arrive on the scene, defendant fled with another man. Officer Ducar did not see any of the people who got out of the vehicles throw anything to the ground while they were running. Defendant ran in Officer Ducar's direction before rounding the corner and heading down an alley when Officer Ducar lost sight of defendant. Officer Ducar did not see anything in defendant's hands when he saw defendant running. After pursuing a different person who he could not catch, Officer Ducar returned to enter the alley where he had lost sight of defendant and saw that defendant had been detained by other officers.

### E. Testimony of Officer Robert Goins

Officer Robert Goins testified that on the morning of June 15, 2014, he was working as an enforcement officer on a narcotics unit along with Officer Heinkel. Based on information Officer Ducar relayed on the radio, Officers Goins and Heinkel relocated to where the black Toyota Camry was parked with five people standing near it. As the officers approached the Camry and exited their vehicle, four of the five men standing by the Camry fled. Officer Goins observed defendant was one of the individuals who fled. Officer Goins lost sight of defendant after defendant turned a corner. He saw defendant again, less than a minute later, exiting a gangway. At that time, Officer Goins observed "defendant toss a dark colored firearm." Officer Goins was about 20 to 30 feet away at the time. Immediately following defendant was another individual who tossed a silver colored firearm to the ground. Officer Goins gave chase after seeing the two men toss the weapons. The two were chased into an alley where Officer Hughes was waiting and defendant and the other man were detained. Defendant was taken to the police station.

At the police station, Officer Goins again saw defendant. He and Officer DiFranco spoke with defendant. Officer Goins advised defendant of his *Miranda* rights, using a preprinted form from the Fraternal Order of Police. Officer Goins then asked defendant if he had defaced the firearms. Defendant replied that they had bought the gun already defaced. No audio or video recording was made of the conversation. Officer Goins memorialized the statement later in his case report from his own memory. Defendant was not asked to write a statement or sign Officer Goins's report.

Officer Goins testified that although he was not working surveillance on June 15, 2014, he had not received any information regarding defendant or that defendant had anything to do with any narcotics transactions. Officer Goins did not see defendant remove a firearm from his waistband; the gun was already in defendant's hand when Officer Goins saw defendant toss it

to the ground. Officer Goins had no knowledge that the guns had been defaced when he saw defendant throw the black handgun to the ground. No audio or video recordings were made during the officers' surveillance on June 15, 2014.

¶ 19 The State rested its case-in-chief, and defendant made a motion for directed finding, which was denied. The parties then stipulated that defendant had never been issued a firearm concealed carry license and that defendant had never been issued a firearm owner's identification card.

¶ 20                                    F. Jury Instructions

¶ 21 The trial court then held a jury instruction conference. The Criminal Code of 2012 (Criminal Code) defines the offense of defacing identification marks of a firearm as follows:

> "(a) Any person who shall knowingly or intentionally change, alter, remove or obliterate the name of the importer's or manufacturer's serial number of any firearm commits a Class 2 felony.
>
> (b) A person who possesses any firearm upon which any such importer's or manufacturer's serial number has been changed, altered, removed or obliterated commits a Class 3 felony." 720 ILCS 5/24-5 (West 2016).

Defendant objected to the use of Illinois Pattern Jury Instructions, Criminal, No. 18.24 (3d ed. 1992), modified, arguing that the "knowing possession" must attach not only to the possession of the firearm, but also to the defacement of the firearm's serial number. The State argued it only had to prove defendant knowingly possessed a firearm that was defaced, and Illinois law did not require the State to also prove that defendant knew that the firearm was defaced. The court found that under *People v. Falco*, 2014 IL App (1st) 111797, ¶ 18, and *People v. Stanley*, 397 Ill. App. 3d 598, 609 (2009), the statute was clear that the State only had to prove that defendant knowingly possessed the firearm and that the firearm's serial number was altered, obliterated, or removed. Defendant did not object to any other jury instruction.

¶ 22                                  G. Defendant's Testimony

¶ 23 Defendant testified he had never been arrested before, had never been charged with a crime before, and had a bachelor's degree in health and physical education from Oklahoma Panhandle State University. On the morning of June 15, 2014, defendant was in Chicago, driving a gray Toyota Camry, with defendant's brother in the back seat and another passenger in the front seat, who they were dropping off from staying the night before. Defendant was wearing blue jeans and a white baseball shirt with blue sleeves. As defendant pulled out of a McDonald's, he encountered a tan Ford 500. Defendant pulled around the block and defendant's brother lowered the window and indicated to the people in the Ford to go and meet up. After parking, the five people exited the vehicles and were having a conversation for five minutes before a car came speeding down the block. As the car approached the group, everybody began to run.

¶ 24 Defendant testified that he did not handle a firearm while standing outside the cars and then running. He testified that he did not own a firearm, that he did not possess a firearm on June 15, 2014, and that he did not throw a firearm. Defendant testified that he did not possess a valid firearm owner's identification card and that he did not possess an Illinois concealed carry license. Defendant stated that he did not feel he needed either because he had no intention of

owning a gun. Defendant testified that he ran away when the car came speeding toward his group because he did not know what was going on and did not want to stand around while everyone else ran off. Defendant testified he did not see the other individuals he was with possess any firearms.

¶ 25　　When defendant ran into an alley, he saw an officer putting on a bulletproof vest. Defendant then stopped and was detained by the officer. After defendant was taken to the police station, defendant was questioned by police. Defendant testified that he was asked if they were about to conduct a robbery or deal drugs, and defendant told police no. Defendant further testified that he was never read his *Miranda* warnings and that no officer asked him about guns.

¶ 26　　In closing arguments, defense counsel argued that defendant credibly testified he did not possess a firearm and that the police officers' testimony was not credible as to seeing defendant with a firearm because they could not have seen a small firearm from 75 feet away. Counsel also argued that Officer Heinzel could not have seen defendant dropping a gun after jumping a fence due to the distance between them. Counsel argued it was improbable that police would ask only one question of defendant and then not ask any follow-up questions.

¶ 27　　　　　　　　　　　　　　　H. Jury Deliberation

¶ 28　　After closing arguments, the trial court instructed the jury that "the State must prove the following proposition: That the defendant knowingly possessed a firearm upon which the serial number has been changed, altered, removed, or obliterated." The court also instructed the jury as to the elements of the charges for AUUW.

¶ 29　　At 2:50 p.m., the jury began deliberations. At 5:13 p.m., a note came from the jury, informing the court that jurors "cannot come to a unanimous decision" and inquiring what should be done. The court replied by instructing the jury to continue deliberations. At 5:55 p.m. the jury sent another note that jurors still cannot agree and that no one had changed his or her mind. The court sent a reply for the jury to keep deliberating. At 6:16 p.m., the jury sent another note asking, "Does it matter that the defendant actually knows the identification marks are defaced on a firearm in his possession?" The court stated to the parties that "Under the *Falco* case and the *Stanley* case, the State must prove the knowing possession of the firearm of the defendant but need not prove the defendant's knowledge of the character of the firearm." Defendant renewed his objection, arguing that knowledge of the defacement was an element of the statute despite the case law and that any other reading meant that the offense *de facto* became a strict liability offense. The State argued that the court should provide a direct answer to the question, and defendant argued that the jury has the law under their instructions and that no further instructions were necessary.

¶ 30　　The trial court found that the note presented a question of law that the court was obligated to answer. The court overruled defendant's objection and sent a note back to the jury, stating "no, the State must prove beyond a reasonable doubt the knowing possession of the firearm. Proof of knowledge of the defacement is not required."

¶ 31　　At 7:22 p.m., the jury sent another note, stating, "We are still at the same point. No one has changed their mind and we have discussed the evidence thoroughly several times, and the count is ten to two." The trial court replied: "Please continue to deliberate." At 8:44 p.m., the court sent the jury home for the evening with an instruction to return by 10 a.m. the next day and resume their deliberations. The next morning the jury began its deliberations at 10:15 a.m.

At 1:25 p.m., the jury returned its verdict, finding defendant guilty of AUUW, based on not having a currently valid license under the Firearm Concealed Carry Act (430 ILCS 66/1 *et seq.* (West 2016)); guilty of aggravated unlawful use of a weapon, based on not having a currently valid firearm owner's identification card; and guilty of defacing identification marks of a firearm.

¶ 32                                   I. Posttrial Motion and Sentencing

¶ 33       Defendant's trial counsel filed a posttrial motion for a new trial. Defendant argued that the knowledge element the crime of defacing identification marks on a firearm applies to knowledge of the defacement, otherwise the statute would create a strict liability offense. Defendant also argued it was error for the State to elicit testimony from Officer Serio about the type of ammunition in the firearm recovered by police. Defendant argued that as a result of these claimed errors the jury was improperly prejudiced and he was denied a fair trial.

¶ 34       The trial court found that "there was sufficient evidence to support the jury's verdict." The court found its answer to the jury question concerning the knowledge of the defacement of a firearm's serial number was "an accurate recitation of the law." The court further found that there was no objection raised to Officer Serio's testimony about the ammunition in the firearm and that if there was any error, then "it was harmless error." At sentencing, the court entered judgment on the conviction for defacing identification marks on a firearm and merged the judgment with the other two counts of AUUW. The court sentenced defendant to 30 days in jail, with credit for time defendant already served; 100 hours of community service; and 24 months' probation. This appeal followed.

¶ 35                                              II. ANALYSIS

¶ 36       Defendant argues that the State failed to prove each element of the offense of defacing the identification marks on a firearm beyond a reasonable doubt and that defendant was deprived of a fair trial because the court made a mistake of law instructing the jury and allowed inadmissible prejudicial testimony into evidence. Defendant claims that his conviction should be reversed, or in the alternative, that we grant a new trial with different jury instructions. The State contends it proved each element of the offense beyond a reasonable doubt, that the jury instructions and answer to the jury's question correctly stated the law, and that no prejudicial testimony was introduced into evidence.

¶ 37                   A. Elements of the Offense of Defacing a Firearm's Serial Number

¶ 38       Defendant argues the State failed to prove him guilty beyond a reasonable doubt because the State had to prove knowledge of the defacement and not simply knowledge of possession of a firearm with defaced identification marks, and the State did not present evidence proving beyond a reasonable doubt that defendant knew the identification markings were defaced on the firearm he possessed. The State argues that it was not required to prove defendant knew the firearm was defaced because the statute and case law require only that defendant knowingly possessed a firearm and that the firearm's identification marks were defaced when defendant possessed it. 720 ILCS 5/24-5(b) (West 2016); *Falco*, 2014 IL App (1st) 111797, ¶ 18; *Stanley*, 397 Ill. App. 3d at 609.

¶ 39        We review claims contesting the sufficiency of the evidence to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

> "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *** When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant. As the United States Supreme Court observed in *Jackson v. Virginia*[, 443 U.S. 307, 319 (1979], 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' The court went on to note that, '[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.' " (Emphasis omitted.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 40        We find the State was not required to prove that defendant knew the firearm he possessed was defaced, and the jury instruction did not misstate the law. Under the Criminal Code, "[a] person who possesses any firearm upon which any such importer's or manufacturer's serial number has been changed, altered, removed or obliterated commits a Class 3 felony." 720 ILCS 5/24-5(b) (West 2016). This court has already addressed the issue raised by defendant in *Stanley*, 397 Ill. App. 3d at 609. We found that under section 24-5(b) of the Criminal Code, the State is only required to prove beyond a reasonable doubt that defendant knowingly possessed a firearm and that the firearm's serial number was defaced. *Id.*

> "The State, however, need not prove knowledge of the character of the firearm. Though the defacement unmistakably bears upon the commission of the offense, it is not an element of the offense. We find support for this interpretation in the Committee Comments to section 4-9, explaining that: '[A] mental-state requirement should be implied as an application of the general rule that an offense consists of an act accompanied by a culpable mental state, as expressed in 4-3.' [Citations.]" *Id.*

The *Stanley* court found that possession of the firearm was an element of the offense, but not knowledge of the defaced serial number, and that the *mens rea* applied to the possession not the character of the weapon. See *id.*

¶ 41        The *Stanley* court also found support for its holding in *People v. Ivy*, 133 Ill. App. 3d 647 (1985). *Ivy* was an appeal by a defendant convicted of possession of a sawed-off shotgun. The defendant argued the State failed to prove its case because the State only showed the defendant knew she possessed a sawed-off shotgun but did not show the defendant knew the illegal character of the sawed-off shotgun. *Id.* at 652. The *Ivy* court held that "it was not necessary to the defendant's conviction that the State prove the defendant knew that possession of a sawed-off shotgun was illegal." *Id.* at 653.

> "[B]ecause of the inherently dangerous nature of sawed-off shotguns and their illegal status *per se*, we do not believe the legislature intended that the unlawfulness of the defendant's possession here should depend upon her familiarity or lack of familiarity with the characteristics of the gun she possessed. Rather, it was sufficient for the defendant's conviction that she have knowledge that she possessed the gun in question, which, because of its dangerous capacity, was the subject of legislative enactment." *Id.*

- 9 -

The *Stanley* court found that the chief evil the legislature sought to prevent in section 24-5(b) was the possession of weapons with defaced identification markings.

> "In adherence to the rationale of *Ivy* \*\*\*, we determine that the *mens rea* applicable to the charge against defendant is knowledge. Moreover, the knowledge required applies only to the possessory component of the offense. Our interpretation is in conformance with the legislature's recognition of the dangerousness posed by defaced weapons. Thus, we perceive that the mere possession of such weapons is the evil sought to be remedied by this offense to, *inter alia*, deter the possession of altered weapons." *Stanley*, 397 Ill. App. 3d at 608.

¶ 42    This court has had a number of opportunities to revisit our holding in *Stanley*, and we have repeatedly reaffirmed *Stanley* and its reasoning. In *Falco*, we were again faced with a defendant contesting a conviction for possession of a firearm with a defaced serial number. *Falco*, 2014 IL App (1st) 111797, ¶ 14. The defendant claimed the jury instruction did not correctly state the law because the instruction failed to include the *mens rea* element. *Id.* ¶ 18. Relying on *Stanley*, we found

> "that although the offense of possession of a defaced firearm does not identify a mental state, the elements of the offense of possession of a defaced firearm are knowledge and possession. Proof of knowledge of the defacement was not required. Therefore, the State must prove the knowing possession of the firearm by defendant but need not prove defendant's knowledge of the character of the firearm." *Id.*

The trial court's instruction in this case reflects the *Falco* ruling that the jury must be instructed that defendant knowingly possessed the firearm that has defaced identification marks.

¶ 43    In addition to following our ruling in *Stanley* in *Falco*, the reasoning behind both decisions has been upheld in analogous cases dealing with knowledge of an element but not knowledge of characteristics. See *People v. Harris*, 2017 IL App (1st) 140777, ¶ 52.

> "*Stanley*'s analysis, which differentiated between knowledge of the act of gun possession from knowledge of the character of the gun, is analogous to the situation here. We distinguish the knowledge of the act of taking a motor vehicle by force from the defendant's knowledge of other circumstances, such as the victim's age or disability. To support a conviction for aggravated vehicular hijacking in this case, the State only had to prove that the defendant knowingly took the motor vehicle by force or threat of force and that Carla was a 'physically handicapped person.' 720 ILCS 5/18-4(a)(1) (West 2012). That is, the State was not required to prove the defendant's knowledge of Carla's deafness to support the aggravated form of the offense under section 18-4(a)(1). Again, we note that had the legislature intended to impose such a knowledge requirement, it could easily have done so by amending section 18-4 to specify a mental state for the circumstances elevating the offense to its aggravated form." (Emphasis omitted.) *Id.*

Defendant contends that despite the prior rulings of this court, decisions by federal courts and courts of other jurisdictions support defendant's interpretation. However, "we need not, nor should we, consider foreign courts' determinations when there is substantial case law in our own state to answer the question presented." *People v. Qurash*, 2017 IL App (1st) 143412, ¶ 34. As noted above, this court, and the legislature, has had ample opportunity to consider the issue of knowledge attaching to the defacement of the firearm as well as its possession. This court has consistently held that under section 24-5(b) the State need only prove knowledge of

possession of a gun that has defaced identification marks, and the legislature has not acted to change the law. The State needed to prove beyond a reasonable doubt only that defendant knowingly possessed a firearm and that the firearm's identification number was defaced. The court properly instructed the jury.

¶ 44                     B. The Trial Court's Answer to a Question From the Jury

¶ 45      Defendant contends that even if the trial court provided the correct jury instructions, the court nevertheless committed reversible error when it answered the jury's question concerning whether the State had to prove defendant knew the gun he possessed had a defaced serial number. During deliberations the jury asked: "Does it matter that the defendant actually knows the identification marks are defaced on a firearm in his possession?" Defendant argues the circumstances were not appropriate for the trial court to answer the jury's question because the giving of an answer would cause, and did cause, the court to express an opinion that impermissibly directed a verdict in favor of the State.

> "Determining the propriety of the trial court's response to a jury question accordingly requires a two-step analysis. First, we must determine whether the trial court should have answered the jury's question. We review the trial court's decision on this point for abuse of discretion. [Citation.] Second, we must determine whether the trial court's response to the question was correct. Because this is a question of law, we review this issue *de novo*." *People v. Leach*, 2011 IL App (1st) 090339, ¶ 16.

¶ 46      We first look to the propriety of the trial court answering the jury's question.

> "The general rule when a trial court is faced with a question from the jury is that the court has a duty to provide instruction to the jury when the jury has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion. [Citation.] Nevertheless, a trial court may exercise its discretion to refrain from answering a jury question under appropriate circumstances. [Citation.] Appropriate circumstances include when the instructions are readily understandable and sufficiently explain the relevant law, where further instructions would serve no useful purpose or would potentially mislead the jury, when the jury's inquiry involves a question of fact, or where the giving of an answer would cause the court to express an opinion that would likely direct a verdict one way or another. [Citation.] Further, the court should not submit new charges or new theories to the jury after the jury commences its deliberations." *People v. Millsap*, 189 Ill. 2d 155, 160-61 (2000).

¶ 47      In this case the issue of whether the trial court should have responded to the jury's question turns on whether the court had a duty to answer. See *People v. Gray*, 346 Ill. App. 3d 989, 992 (2004) ("Generally, a trial court has a duty to answer when a jury raises (1) an explicit question (2) on a point of law (3) about which the jury indicates doubt or confusion."). The jury's question here was explicit; it was a question of law because it dealt with the *mens rea* requirement and the construction of its jury instruction (*Leach*, 2011 IL App (1st) 090339, ¶ 17 ("the construction of a jury instruction is a question of law")); and the jury expressed confusion over what the State was required to prove defendant had knowledge of. We cannot say that the trial court's decision to answer the jury's question was arbitrary or unreasonable, or that no reasonable court would take the view adopted by the trial court here. Therefore, the trial court did not abuse its discretion deciding to answer the jury's question.

¶ 48　　Turning to the propriety of the trial court's answer, as noted above, the State was required to prove beyond a reasonable doubt that defendant knowingly possessed a firearm and that the firearm had a defaced serial number. *Stanley*, 397 Ill. App. 3d at 609; *Falco*, 2014 IL App (1st) 111797, ¶ 18. Thus, the court's answer correctly stated the law. Defendant claims the court erred answering the jury's question because the court's answer deprived the jury of any meaningful role as factfinder. We disagree. The court's answer to the jury's question did not express an opinion on an issue of fact. The court's answer simply stated that the knowledge requirement applied to the possession of the weapon and not to the defacement of the weapon's serial number. Prior to the defense putting on its case, the court held arguments on which instructions the jury would receive. Defendant objected to the instruction concerning the charge of defacement of the identification markings of a firearm, and the court ruled against defendant, finding the State only had to prove defendant had knowledge of possessing the firearm, not knowledge of the defaced serial number. Defendant was able to present a defense with this knowledge, and the court's answer to the jury's question restated the same position the court articulated to defendant after defendant objected to the jury instruction. The court did not insert a new matter for the jury that deprived the jury of any meaningful role as factfinder.

¶ 49　　Moreover, the record affirmatively refutes that the jury's verdict was a foregone conclusion after the trial court's reply to the jury's question. After the court answered the jury's question, the jury continued to deliberate for about an hour when it sent a note to the court, indicating no juror had changed their vote and they were still deadlocked. That jurors continued to deliberate for several hours after receiving the court's answer to its question meant that jurors still had questions about defendant's guilt left unresolved by the court's answer. The court's answer to the jury's question did not express an opinion on whether defendant possessed the required mental state. The court's answer informed the jury of what the State was required to prove beyond a reasonable doubt.

¶ 50　　The court did not abuse its discretion by choosing to answer the jury's question, and the court's answer did not misstate the law. *Stanley*, 397 Ill. App. 3d at 609; *Falco*, 2014 IL App (1st) 111797, ¶ 18. Therefore, the trial court did not err in providing its answer to the jury's question. *Leach*, 2011 IL App (1st) 090339, ¶ 16.

¶ 51　　　　　　　　C. Evidence Defendant Knowingly Possessed a Firearm
　　　　　　　　　　　　With Defaced Serial Number

¶ 52　　Defendant argues that the evidence produced at trial was not sufficient to prove beyond a reasonable doubt that defendant knowingly possessed a firearm with identification marks defaced. We disagree. The State provided evidence sufficient to prove beyond a reasonable doubt that defendant knowingly possessed a firearm through the testimonies of Officers Ducar, Goins, and Heinzel.

¶ 53　　Officer Ducar testified that he witnessed, from 75 feet away, defendant put a black handgun in his waistband. After officers arrived and defendant fled, Officers Heinzel and Goins testified they witnessed defendant with a black handgun in his hand and saw defendant toss the handgun to the ground and keep running. Officers Heinzel and Goins were both about 25 feet away from defendant when they witnessed him holding and tossing the gun. Officer Heinzel recovered a black revolver where he witnessed defendant toss a black handgun, and Officer Serio testified that the revolver's serial number was defaced. The State thus presented eyewitness testimony that defendant possessed a handgun that had a defaced serial number.

- 12 -

¶ 54    Defendant argues that he presented a credible account of what transpired on June 15, 2014, and that he neither possessed a firearm at that time nor did he previously own a firearm or wish to own a firearm. Defendant contends that the State's evidence was improbable and unsatisfactory and that there remained reasonable doubt that defendant was not guilty. "[I]t is not the function of this court to retry the defendant. *** Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside." *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000). The jury heard defendant's testimony that he did not possess a firearm, as well as the conflicting testimony of the police officers who arrested defendant and testified at trial that they saw him discard a weapon, and that defendant stated the weapon was already defaced when he acquired it. After considering the various testimonies and evidence, the jury concluded that defendant possessed the firearm and was therefore guilty of the offense of defacing the identification marks of a firearm. "[T]he jury could properly reject defendant's theory of innocence. Moreover, the trier of fact is not required to disregard inferences which flow normally from the evidence and to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *Id.* at 332. We cannot say that no rational trier of fact would reach the same conclusion as the jury did here. Therefore, we reject defendant's challenge to the sufficiency of the evidence convicting him of defacing identification marks of a firearm. *Collins*, 106 Ill. 2d at 261.

¶ 55                          D. Admission of Prejudicial Testimony
¶ 56    Defendant argues that he was deprived of his right to a fair trial because the trial court allowed the State to elicit prejudicial testimony. Defendant claims that the State elicited testimony from the arresting officers that defendant was arrested in a high-crime area known for narcotics trafficking, in contravention of the trial court's ruling on defendant's motion *in limine*. Defendant also claims that Officer Serio's testimony concerning the dangerous character of the hollow point bullets found in defendant's gun was unduly prejudicial. Defendant argues admission of this evidence was so prejudicial that it deprived defendant of a fair trial and therefore constituted reversible error.

¶ 57    We note that defendant did not allege in his posttrial motion that the admission of testimony that defendant was arrested in a high-crime area was error. Defendant also failed to make a contemporaneous objection at trial when Officer Serio's testimony was elicited about the nature of the bullets found in the gun. Defendant did raise the issue of the nature of the bullets in his posttrial motion. However, we conclude neither issue was preserved for review. Illinois Rule of Evidence 103(b) (eff. Oct. 15, 2015) reads, in pertinent part, as follows:

> "(1) Civil and Criminal Cases. In civil and criminal trials where the court has not made a previous ruling on the record concerning the admission of evidence, a contemporaneous trial objection or offer of proof must be made to preserve a claim of error for appeal.
>
> (2) Criminal Cases. In criminal trials, once the court rules before or at trial on the record concerning the admission of evidence, a contemporaneous trial objection or offer of proof need not be renewed to preserve a claim of error for appeal.
>
> ***

(4) Posttrial Motions. In all criminal trials and in civil jury trials, in addition to the requirements provided above, a claim of error must be made in a posttrial motion to preserve the claim for appeal. Such a motion is not required in a civil nonjury trial."

Therefore, pursuant to Rule 103(b), defendant forfeited his claim of error with regard to the admission of testimony about the allegedly high-crime nature of the area where defendant was arrested when he did not raise this issue in his posttrial motion. Similarly, in regard to the officer's testimony about the types of bullets found in the gun, there was no previous ruling on the record by the court about the admissibility of testimony concerning the nature of the bullets in the firearm; therefore, pursuant to Rule 103(b)(1), a contemporaneous objection was required to preserve the issue for review. Defendant's inclusion of the issue in his posttrial motion was not "in addition to" a contemporaneous trial objection; therefore, the issue is forfeited. Ill. R. Evid. 103(b)(4) (eff. Oct. 15, 2015); see also *People v. Watt*, 2013 IL App (2d) 120183, ¶ 33 ("Where a defendant fails to object at trial, even though he includes the error in his posttrial motion, forfeiture still occurs.").

¶ 58        Defendant argues that both evidentiary issues should be reviewed for plain error. "The plain-error doctrine allows a reviewing court to reach a forfeited error *** where the evidence is so closely balanced that the jury's guilty verdict might have resulted from the error and not the evidence ***." *Id.* ¶ 35.

> "We now reiterate that the plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

See also Ill. R. Evid. 103(e) (eff. Oct. 15, 2015). We will review the claimed errors in the admission of the testimony about the allegedly high-crime nature of the area and the dangerous nature of the bullets in the gun under the plain-error standard. The first step of this analysis is to determine whether error occurred. *Piatkowski*, 225 Ill. 2d at 565.

¶ 59        First, we find that defendant's argument, that the admission of evidence regarding the "high crime" reputation of the neighborhood where defendant was arrested constitutes error, fails. Defendant contends that evidence introduced by the State at trial and discussed in its rebuttal and closing arguments violated the trial court's order excluding any reference to the area of the crime being a high-crime area. Defendant concedes that, pursuant to the trial court's pretrial ruling on his motion *in limine*, the "prosecutor was permitted to establish why the team of officers [were] in the area at the time of the incident." Defendant argues that testimony concerning the area being known for high-volume narcotics sales along with an explanation of what a controlled buy consists of went beyond establishing why the team of officers was in the area, in violation of the trial court's order and, as such, constitutes error. The State argues the complained-of testimony was innocuous foundation for the subsequent events and allowed the jury to understand why the officers happened to be in the area. We agree with the State.

¶ 60        The State asked Officer Hughes about his assignment on the night of defendant's arrest. Officer Hughes testified the officers were "setting up in the 4th District in a location known for high volume narcotics sales to make a controlled purchase of narcotics." He then explained what a controlled buy is. "A controlled buy is an undercover officer, has pre-recorded serial

number money and they go out and they try to buy drugs from someone who is selling dope on the street." Officer Hughes said nothing else about the area where defendant was arrested or narcotics investigations generally. Subsequently, Officer Heinzel testified his assignment that night was as an enforcement officer, meaning that when police "perform undercover buys, [his] *** action is to perform the arrest and to remain close by for security." Officer Heinzel said nothing more about the officers' assignment that night or narcotics activity in the area of the arrest. Officer Ducar testified he was assigned to the narcotics division of the Chicago Police Department. He testified that on the night of defendant's arrest he was "surveillance officer for the narcotics division." Officer Goins also testified he was assigned to the narcotics unit on the night of the arrest and that he was also working as an enforcement officer. Officer Goins testified that he was in the area where they first saw the vehicle defendant was in "as part of a team investigating narcotics." The testimony was foundation for the subsequent events and allowed the jury to understand why the officers happened to be in the area.

¶ 61 The officers' testimony in this case also does not amount to other crimes evidence because the testimony does not imply defendant "had engaged in an uncharged offense, narcotics trafficking." *People v. Agee*, 307 Ill. App. 3d 902, 904 (1999). In *Agee*, an officer testified that he was assigned to a special operations unit concentrating on narcotics and gang weapons activity and that the area where he encountered the defendant was a high-narcotic-activity area. *Id.* The officer also described his narcotics investigations. *Id.* Additionally, in *Agee*, the officer testified that the defendant and another man made a " 'hand to hand transaction,' " which he testified means "that one of the men handed the other man an unknown item." *Id.* at 903. The officer also testified the defendant approached his police vehicle, looked inside, and then walked away. *Id.* The *Agee* court noted that

> "[e]vidence of crimes for which defendant is not on trial is inadmissible if relevant merely to establish defendant's propensity to commit crimes. [Citation.] The rationale is that such evidence overpersuades the jury, which is likely to convict defendant because it feels he is a bad person deserving punishment, rather than on the basis of facts related to the offense on trial. [Citation.]" *Id.* at 904.

The *Agee* court held the officer's testimony was inadmissible, and unfairly prejudicial, because "[a] reasonable possibility exists that the improper testimony implying defendant's involvement in narcotics trafficking damaged his credibility and contributed to his conviction." *Id.* at 906. *Agee* is distinguishable.

¶ 62 In *Agee*, the officer testified that the defendant engaged in what looked like a drug transaction and implied that the defendant approached his vehicle to sell him drugs. On the contrary, in this case none of the officers testified to anything that would imply defendant engaged in a drug transaction beyond the coincidence of being in the area where they were conducting their investigation. Nothing in the officers' testimony implied they considered that mere presence when deciding to follow or stop defendant. *Cf. In re Mario T.*, 376 Ill. App. 3d 468, 476-77 (2007) (rejecting attempt to justify stop and frisk based on officer's testimony location was a high-crime area). Moreover, the officers' testimony in this case was brief and limited to why the team of officers was in the area at the time of the incident. If Officer Heinzel's testimony stating the investigation took place in a location known for high-volume narcotics sales and describing a controlled buy was objectionable, we would not find the testimony to be so prejudicial as to have materially contributed to defendant's conviction. See *People v. Davis*, 2018 IL App (1st) 152413, ¶ 63. Thus, we find no error in the admission of

any of the officers' testimony in this regard. "Because there was no error, there can be no plain error." *People v. Castillo*, 2018 IL App (1st) 153147, ¶ 43.

¶ 63 Next, turning to the dangerous nature of the bullets recovered from the gun defendant allegedly possessed, defendant argues that the State elicited unfairly prejudicial testimony when Officer Serio testified about the character of the bullets. Defendant argues that plain error exists under the first prong of the plain-error doctrine. The State contends the evidence at trial was not closely balanced and that the trial court did not err admitting the testimony. The burden of persuasion is on the defendant trying to establish plain error. *People v. Herron*, 215 Ill. 2d 167, 182 (2005).

¶ 64 "[O]therwise relevant evidence is inadmissible if its probative value is outweighed by such dangers as unfair prejudice, jury confusion, or delay." (Internal quotation marks omitted.) *People v. Walston*, 386 Ill. App. 3d 598, 610 (2008). "Evidence is considered 'relevant' if it has any tendency to make the existence of any fact that is of consequence to the determination of an action more or less probable than it would be without the evidence." *People v. Illgen*, 145 Ill. 2d 353, 365-66 (1991). Evidence is admissible if it is directly probative of an element of the offense. See *People v. Hester*, 271 Ill. App. 3d 954, 958 (1995) ("defendant's prior conviction was properly admitted as evidence directly probative of that element of the offense, similar to the admission of evidence relevant to any other element of an offense"). Evidence is inadmissible, and its admission may be reversible error, if it has little to no probative value and its only purpose is to stir the emotions of the jury. See *People v. Orange*, 168 Ill. 2d 138, 161 (1995); *People v. Iniguez*, 361 Ill. App. 3d 807, 817 (2005).

¶ 65 Defendant was charged with, *inter alia*, aggravated unlawful use of a weapon based on not having a currently valid license under the Firearm Concealed Carry Act (430 ILCS 66/1 *et seq.* (West 2016)). 720 ILCS 5/24-1.6(a)(3)(A-5) (West 2016). A defendant commits this offense if "the pistol, revolver, or handgun possessed was uncased, *loaded*, and immediately accessible at the time of the offense and the person possessing the pistol, revolver, or handgun has not been issued a currently valid license under the Firearm Concealed Carry Act." (Emphasis added.) *Id.* Officer Heinzel testified that the revolver he recovered from where defendant tossed it was loaded with five bullets. Officer Serio testified that he examined both the gun and the bullets. Officer Serio testified that there were two types of bullets, full metal jacket and hollow point, and that they were live rounds. This testimony was proper because it relates to an element of one of the offenses charged. However, the State proceeded to elicit further testimony about the dangerous character of the hollow point bullets. The character of the bullets is not an element of any of the offenses the State charged defendant with violating. There is no relationship between the charges against defendant and Officer Serio's testimony that hollow point bullets are designed to do more damage to their target by opening up like a flower and are different from full metal jacket bullets because a full metal jacket bullet will maintain its shape when fired. This testimony provided no probative value while being highly prejudicial.

¶ 66 As its sole justification for the introduction of this evidence, the State argues that this testimony was introduced to show motive for defendant to have "bought a defaced, untraceable gun." While evidence of motive can be properly introduced, when the State undertakes to prove facts which the State asserts constitute motive for a crime charged, it must be shown that the accused knew of those facts. *People v. Smith*, 141 Ill. 2d 40, 56 (1990). "This rule seeks to avert the very real danger that through the guise of motive evidence, the State may present to

- 16 -

the jury highly inflammatory matter which, in actuality, is of little or no probative value." *Id.* at 57. The State introduced no facts to show defendant knew two of the bullets in the gun at issue were hollow point bullets or that defendant knew the dangerous nature of these bullets. Thus, the State's motive argument only serves to confirm the highly prejudicial and inflammatory nature of the evidence concerning the dangerousness of hollow point bullets. See *id.* at 58-59 (finding plain error in admission of motive evidence where the State failed to prove the accused knew of the facts introduced to establish motive and thus the evidence could "do little more than excite a suspicion of guilt in the minds of the jurors" (internal quotation marks omitted)). The evidence elicited by the State regarding the dangerous nature of two of the bullets recovered from the gun has no relevance to any of the charges against defendant, and with no probative value, this evidence only prejudices, confuses, and misleads the jury, thereby constituting clear error. See *Piatkowski*, 225 Ill. 2d at 565 (plain-error doctrine allows a reviewing court to consider unpreserved error when a clear or obvious error occurred).

¶ 67   This finding of clear error does not end our analysis, as the next step under the first prong of the plain-error analysis is to "decide whether the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *People v. Sebby*, 2017 IL 119445, ¶ 51. An error is prejudicial because it occurred in a close case where its impact on the result was potentially dispositive. *Id.* ¶ 68.

> "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case. [Citations.] That standard seems quite simple, but the opposite is true. A reviewing court's inquiry involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.* ¶ 53.

Further, lengthy jury deliberations and jury notes during deliberations, indicating that they had reached an impasse, demonstrate the closely balanced nature of the evidence in a case. *People v. Wilmington*, 2013 IL 112938, ¶ 35; *People v. Lee*, 303 Ill. App. 3d 356, 362 (1999) (holding that the evidence was closely balanced under the plain-error analysis based on the jury being deadlocked for several hours and on three occasions indicating that it could not reach a unanimous verdict); *People v. Aguirre*, 291 Ill. App. 3d 1028, 1035 (1997) (finding a close case under the plain-error doctrine as evidenced by the jury's note requesting police reports and witnesses' statements and by the note stating that the jury was split 10 to 2). The closely balanced standard errs on the side of fairness and we will grant a new trial even where the evidence could sustain a conviction beyond a reasonable doubt. *People v. Cosmano*, 2011 IL App (1st) 101196, ¶ 75; see also *Herron*, 215 Ill. 2d at 193 ("We deal with probabilities, not certainties; we deal with risks and threats to the defendant's rights. When there is error in a close case, we choose to err on the side of fairness, so as not to convict an innocent person.").

¶ 68   Defendant argues that the evidence was closely balanced because both parties presented plausible versions of events that occurred that day. The State argues the evidence was not closely balanced because the four officers testified credibly and consistently to a coherent narrative of events, defendant's testimony was uncorroborated, and defendant failed to reach the quantum of evidence presented by the State. We reject the State's argument. A commonsense assessment of the evidence reveals that it was closely balanced.

¶ 69   The State presented evidence that Officers Hughes, Heinzel, Ducar, and Goins testified to a narrative of events where defendant obtained a firearm from the trunk of his car, placed the gun

in his waistband as observed by one officer, saw police and tried to get away by running through the neighborhood and, after seeing officers approaching him, attempted to drop the defaced firearm. Defendant, on the other hand, contends that he, his brother, and his friend were leaving McDonald's when they ran into friends. After everyone parked, the friends got out and began talking when another vehicle sped toward them. Defendant testified that he ran away from the vehicle because he was following the others in the group and that he did not know the area and did not want to find out who was in the vehicle that came speeding toward his group. When defendant saw an officer, he immediately stopped running. Both versions of events are plausible. Defendant's testimony is also consistent with the officers' testimony in several ways. See *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 73 ("In [*People v.*] *Naylor*, 229 Ill. 2d [584,] 606-07 [(2008)], our supreme court analyzed whether the case was closely balanced because of a 'contest of credibility.' In that case, the court stated the defendant's testimony was 'credible in that it [was] consistent with much of the officers' testimony and the circumstances of his arrest.' *Naylor*, 229 Ill. 2d at 607.").

¶ 70     Defendant's account of events is credible in that it is plausible and consistent with much of the officers' testimony, and neither version is supported by corroborating evidence; thus, the outcome in this case depended on whether the jury found the officers or defendant more credible. Therefore, the evidence was closely balanced. *People v. Naylor*, 229 Ill. 2d 584, 608 (2008).

> "Of course this evidence was closely balanced. The evidence boiled down to the testimony of the two police officers against that of defendant. Further, no additional evidence was introduced to contradict or corroborate either version of events. Thus, credibility was the only basis upon which [the] defendant's innocence or guilt could be decided." *Id.*

We also find the testimony describing the dangerous nature of the bullets found in the gun as designed to inflict greater damage to their target could have affected the weight the jury attributed to defendant's testimony and caused it to render a verdict on an improper basis. Accordingly, we find the evidence is so closely balanced that the error alone threatened to tip the scales of justice against defendant See *id.* at 606-08.

¶ 71     That the evidence is closely balanced in this case is further supported by the jury deliberations. Jury deliberations began at 2:50 p.m. on June 29, 2014. At 5:13 p.m., the jury sent a note stating that they could not reach a unanimous decision and requested instruction on what they should do. The jury was instructed to continue its deliberations. At 5:55 p.m., the jury sent out a similar note indicating they could not agree. The jury was again instructed to continue deliberating. At 6:16 p.m., a note was sent asking for clarification as to whether the defendant must know the firearm in his possession was defaced to which the trial court responded in the negative. The jury continued to deliberate for another 5 hours and 53 minutes before reaching a verdict. During this time, at approximately 7:22 p.m., the jury sent another note indicating they were still deadlocked. The jury was instructed to continue deliberating. The jury was sent home at 8:44 p.m. and returned at 10 a.m. the following day, June 30, 2014, at which time deliberations continued. The jury finally reached a verdict at 1:25 p.m., after more than nine hours of deliberation. As in *Lee*, the evidence is closely balanced where the jury was deadlocked for several hours and on three occasions indicated it could not reach a unanimous verdict. *Lee*, 303 Ill. App. 3d at 362. "As our cases clearly indicate *** prejudice rests not upon the seriousness of the error but upon the closeness of the evidence. What makes

an error prejudicial is the fact that it occurred in a close case where its impact on the result was potentially dispositive." *Sebby*, 2017 IL 119445, ¶ 68. "When there is error in a close case, we choose to err on the side of fairness, so as not to convict an innocent person." *Herron*, 215 Ill. 2d at 193.

¶ 72 We find defendant has shown clear error in a closely balanced case, and he is therefore entitled to relief under the first prong of the plain-error doctrine. *Sebby*, 2017 IL 119445, ¶ 64. We have reviewed the evidence at trial and find it was sufficient for a trier of fact to conclude that defendant was guilty beyond a reasonable doubt of the charges against him. We therefore find that there is no double jeopardy impediment to a new trial. *People v. Porter*, 168 Ill. 2d 201, 215 (1995); *People v. Taylor*, 76 Ill. 2d 289, 309 (1979). We further note that we have made no finding as to defendant's guilt that would be binding on retrial. *People v. Jones*, 175 Ill. 2d 126, 134 (1997); *Porter*, 168 Ill. 2d at 215. Therefore, defendant's convictions for defacing identification markings of a firearm and for two counts of AUUW are reversed, and the cause remanded for a new trial.

¶ 73                                III. CONCLUSION

¶ 74 For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the cause remanded.

¶ 75 Reversed and remanded.

¶ 76 JUSTICE ELLIS, specially concurring:

¶ 77 I concur in the judgment to reverse and remand, and I concur in the majority's reasoning in all respects but one: I believe that the State is required to prove that the defendant knew that the firearm he possessed was defaced. The seminal case holding otherwise, *People v. Stanley*, 397 Ill. App. 3d 598, 607 (2009), was wrong when it was decided and is even more obviously wrong today, in a world where the mere possession of a firearm, without more, cannot be constitutionally prohibited. We should say so.

¶ 78 Section 24-5(b) of the Criminal Code provides that "A person who possesses any firearm upon which any *** serial number has been changed, altered, removed or obliterated commits a Class 3 felony." 720 ILCS 5/24-5(b) (West 2016). As written, the statute thus takes the form of a "strict" or "absolute" liability offense: It has no explicit *mens rea* requirement.

¶ 79 The legislature can create absolute liability for a felony, but only if it "clearly indicates" its intent to do so. *Id.* § 4-9. That intent will not be inferred from the "mere absence" of a *mens rea* requirement in the statute. *People v. Gean*, 143 Ill. 2d 281, 286 (1991). As *Stanley*, 397 Ill. App. 3d at 607, correctly noted, there is no clear statement of that intent in section 24-5(b). Thus, we must presume that the legislature did not intend to impose absolute liability for possessing a defaced firearm.

¶ 80 To avoid absolute liability, a *mens rea* must be inferred into the statute. For a possessory offense, we must infer at least a mental state of *knowledge*. 720 ILCS 5/4-2 (West 2016) (possession must be knowing to qualify as voluntary act, as required for criminal liability); see also *Gean*, 143 Ill. 2d at 288 ("knowledge is the appropriate mental element" to infer into possessory offense). The question is which element(s) of the statute the knowledge

- 19 -

requirement must govern. I would hold that the offense requires proof that defendant knew the firearm in his possession was defaced.

¶ 81    In *Stanley*, and cases following it, we reached the opposite conclusion, holding that "knowledge of the character of the firearm" is not required. *Stanley*, 397 Ill. App. 3d at 609. Under *Stanley*, it suffices to prove that the defendant knowingly possessed a firearm, and that the firearm—whether the defendant knew it or not—was defaced. *Id.*; see also *Falco*, 2014 IL App (1st) 111797, ¶ 18. A defendant who knowingly possesses a firearm thus takes the firearm as he finds it: If it turns out to be defaced, he will suffer whatever criminal liability that fact triggers, whether he was aware of it or not. (And the same goes for any other prohibited feature the firearm turns out to have—*e.g.*, being a sawed-off shotgun. See *Ivy*, 133 Ill. App. 3d 647.)

¶ 82    *Stanley* was wrongly decided for at least two reasons. First, its reasoning was indefensible. It held that knowledge of the defacement is not required because defacement "is not an element of the offense" in the first place. *Stanley*, 397 Ill. App. 3d at 609. So if defacement is not an element, there is only one place to infer the knowledge requirement: with respect to the mere act of possessing a firearm.

¶ 83    But of course, the defacement *is* an element of the offense. In the parlance of the Criminal Code, it is an "attendant circumstance" of an individual's conduct. See 720 ILCS 5/4-5(a) (West 2016). If the defacement were not an element, the State would not have to prove it at all. It could prove possession of a *defaced* firearm simply by proving possession of *any* firearm, defaced or not. That would be absurd. And we cannot avoid that absurdity by purporting to distinguish, as *Stanley* did, between an element and a fact that "unmistakably bears upon the commission of the offense." *Stanley*, 397 Ill. App. 3d at 609. It "unmistakably bears upon" the crime, but it is not an element? It's not something the State has to prove? Is it just an interesting detail? That phrase is just a muddled, evasive way to refer to an element of the offense, which, in plainer terms, is simply a fact for which the statute requires proof beyond a reasonable doubt.

¶ 84    Second, as *Stanley* construed the defacement statute, it still imposes absolute liability, even though that is precisely the result that *Stanley* (correctly) set out to avoid.

¶ 85    As written, the defacement statute has two elements: possession and defacement of a firearm. Possession of a firearm, by itself, is not a crime. Nor is knowing possession of a firearm. Indeed, any statute that criminalized the knowing possession of a firearm—full stop, without more—would clearly violate the second amendment, as interpreted in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and *District of Columbia v. Heller*, 554 U.S. 570 (2008).

¶ 86    To define a *constitutionally permissible* offense, another element is necessary—some fact about the firearm or the circumstances of its possession that the second amendment does not protect. Defacement is one example of such an additional fact. Thus, in the statute we are considering, the defacement is more than just an element, on par with any other; it is the element that *allows the legislature to enact this offense in the first place* without being blatantly unconstitutional. The additional fact of defacement is the *only* thing in this statute that validly makes the firearm possession a crime.

¶ 87    This means that, to avoid imposing absolute liability, the statute must be construed to require proof that the defendant knew the firearm was defaced. If the statute did not require knowledge of the defacement, the defendant's otherwise innocent conduct (knowingly possessing a firearm) would be transformed into a felony by a circumstance (the defacement) of which he was unaware. And if a person can be made to wander into felony liability

- 20 -

unwittingly, just by engaging in otherwise innocent conduct, then the felony liability imposed by the statute is "absolute" or "strict," indeed.

¶ 88    That is the lesson of *Gean*, 143 Ill. 2d 281. There, the supreme court construed a "chop shop" statute aimed at prohibiting the receipt of stolen vehicles. *Id.* at 289. In technical terms, at issue were two different Class 4 felony provisions: (1) one prohibiting the possession "without authority" of certain vehicle items (such as certificates of title or salvage certificates) and (2) another prohibiting the possession of these same items "without complete assignment." (Internal quotation marks omitted.) *Id.* at 283-84; see Ill. Rev. Stat. 1987, ch. 95½, ¶ 4-104(a)-(b).

¶ 89    Like the defacement statute, the provisions at issue in *Gean* did not include any explicit *mens rea* requirement. Because the legislature did not clearly express an intent to create absolute liability for this felony possession offense, a *mens rea* of knowledge had to be inferred. *Gean*, 143 Ill. 2d at 286-88. The question was which elements required such knowledge. Did the defendant merely have to know he was possessing the vehicle title or similar item? Or did the State have to prove that the defendant knew that his possession of the item was "without authority" (in the one subsection) or that the items he possessed were "without complete assignment" (in the other subsection)?

¶ 90    The supreme court inferred a knowledge requirement into the latter elements of each subsection; the State had to prove that the defendant knew that his possession of the certificate was "without authority" as for the first subsection, and that the defendant knew that the certificates he possessed were "without complete assignment" in the second. *Id.* at 288.

¶ 91    Why? Because, as the supreme court explained, "[k]nowledge generally refers to an awareness of the existence of the facts *which make an individual's conduct unlawful*." (Emphasis added.) *Id.* Possessing a car title, alone, is not unlawful; if it were, every car owner in Illinois would be a criminal. It was the knowledge that the car was stolen—that the defendant knew his possession of the certificate or other item was "without authority" or that he knew the item had not been validly "assigned"—that differentiated innocent conduct from criminal conduct.

¶ 92    The same holds true here. We have perfectly innocent conduct (possession of a firearm, without more) combined with an attendant circumstance that transforms that conduct from legal to illegal—the fact that the firearm is defaced. If we don't infer a knowledge requirement into the part of the statute that renders the actor a criminal, we are imposing absolute liability for a Class 3 felony, without the requisite clear indication that the legislature attempted to do so.

¶ 93    To put this point in its proper context, contrast the defacement statute with the aggravated vehicular hijacking statute, cited here by the State. A person commits vehicular hijacking if he *knowingly* takes a motor vehicle by force or threat of force. 720 ILCS 5/18-3(a) (West 2016). A person commits aggravated vehicular hijacking if he commits vehicular hijacking under section 18-3(a) and an aggravating factor is present—for example, a victim is under 16 years old, over 60, or physically disabled. *Id.* ¶ 18-4(a)(1)-(2).

¶ 94    The statute does not require knowledge that an aggravating factor is present; there is no explicit *mens rea* requirement with respect to the circumstances that aggravate the offense. See *id.* And we have refused to infer one. *Harris*, 2017 IL App (1st) 140777, ¶ 52.

¶ 95    But that is different. The aggravated vehicular hijacking statute does not transform legal conduct into illegal conduct without the actor's knowledge. The actor has already committed vehicular hijacking—that is, he has already *knowingly* taken a car by force or threat. The aggravated vehicular hijacking statute just aggravates the offense based on the character of the victim. The legislature could rationally decide that a carjacker takes his victims as he finds them, regardless of whether he *knew* they were minors, elders, or disabled. No absolute liability exists there, however, because the knowledge requirement applies to the action that makes it criminal—the theft of the car in the first place.

¶ 96    Taking your carjacking victims as you find them is very different than taking your firearms as you find them. The law made the vehicular hijacker take his chances with his victims, but only because he knowingly committed a criminal act in the first place. The law did not make him wander inadvertently into a felony—due to circumstances beyond his knowledge—while he was doing something that was otherwise legal. But that is exactly what the law does to those who possess firearms, at least as *Stanley* construed the defacement statute. And *Gean* tells us that result is wrong.

¶ 97    To be fair, *Stanley* was decided before *McDonald* incorporated the rule of *Heller* against the states. So perhaps it was not so easy to say, at the time *Stanley* was decided, that knowingly possessing a firearm, full stop, is not and cannot be a crime under Illinois law. But that is no reason for us to continue to follow *Stanley*. At a minimum, it cannot be good law in a post-*Heller* world. If *Gean* was not the controlling precedent on this question before *Heller* and *McDonald*, it most certainly is now.

¶ 98    We should apply the principles of *Gean* to the defacement statute and hold, for the reasons explained by our supreme court, that it requires proof that the defendant knew the firearm in his possession was defaced. We should stop following *Stanley*, no matter how many other courts have adhered to it.