THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TRACEY IVY, Defendant-Appellant.

Fifth District   No. 5—83—0737

Opinion filed May 14, 1985.

Daniel D. Yuhas and John J. Hanlon, both of State Appellate Defender's Office, of Springfield, for appellant.

John R. Clemons, State's Attorney, of Murphysboro (Kenneth R. Boyle, Stephen E. Norris, and Vito A. Mastrangelo, all of State's Attorneys Appel-

late Service Commission, of counsel), for the People.

PRESIDING JUSTICE JONES delivered the opinion of the court:

On October 20, 1982, the defendant, Tracey Ivy, was charged by a two-count information with the offenses of unlawful use of weapons and aggravated assault. The charges arose out of an incident that occurred at her apartment in Carbondale on October 19, 1982. Following a bench trial the defendant was convicted of both offenses and sentenced to 12 months' probation on each count, with the sentences to run concurrently. The defendant was also fined $100 on the weapons conviction and ordered to pay costs on both counts. On appeal from this conviction and sentence, the defendant contends that the evidence failed to show that she "knowingly" possessed the illegal weapon for purposes of the unlawful-use-of-weapons charge and that there was no showing of the "reasonable apprehension of receiving a battery" element necessary for the aggravated assault charge. In addition the defendant asserts that the court abused its discretion in ordering her to pay a fine without a showing of her financial ability to do so. We affirm.

At trial, complaining witness Denise Sheehan testified that on the date in question, she and two of her roommates, Christy St. John and Cheryl Frost, went to the defendant's apartment for the purpose of collecting some money that the defendant owed them. When they arrived at the apartment, they knocked on the door and were allowed in by a young man who told them that Tracey was in the bathroom. After going to the back of the apartment and apparently talking to the defendant for a few minutes, the man then left the apartment. A few minutes later the defendant emerged from the back of the apartment. Ms. Sheehan asked the defendant to pay her the money that she owed to Ms. Sheehan, and the defendant replied that she would pay Ms. Sheehan when her loan came through. The amount of this debt, which resulted from the defendant's subletting an apartment from Ms. Sheehan, was $113.

An argument developed between the defendant and Ms. Sheehan, and the defendant asked the three young women to leave. The defendant repeated this request and opened the door of the apartment to encourage their leaving. When the three persisted in their efforts to settle the debt, the defendant stated that she would "blow you away, girl" and walked over to a bed in the apartment, where she bent down and pulled a duffel bag out from underneath the bed. The defendant raised the bag and pointed it at Ms. Sheehan.

The defendant then repeated both her request that the women

leave and her threats to "blow you [Ms. Sheehan] away." The defendant continued to move closer to Ms. Sheehan until they were about three feet apart and the duffel bag was pointed at Ms. Sheehan's face. Ms. Sheehan stated that she "wasn't paying much attention" to what the defendant was pointing at her until she noticed that her friends were backing away and that their faces showed fear. At this point, she stated, she "really thought about what was happening [and] decided [she had] better get out of there." The three women then left and ran to the police station on foot, although they had a car parked outside. Ms. Sheehan testified that she left because she "felt threatened" and that the duffel bag had been pointed at her for at least three minutes before she decided to leave.

During her testimony Ms. Sheehan identified a blue nylon duffel bag produced by the State as the bag that the defendant had retrieved from under the bed and pointed at her. Ms. Sheehan stated that she did not see the contents of the bag and that no item was ever removed from it, but that the bag was "draped over" something inside it and that it was an item with some bulk because the defendant had difficulty pulling it out from under the bed. The bag was later found to contain a 20-gauge single-shot shotgun with a barrel measuring $15^{7}/_{8}$ inches.

Cheryl Frost also testified for the prosecution that during the incident in question the defendant "kept pointing [the duffel bag] right at [Ms. Sheehan's] head" and that she "had it really close to her." The bag was "wrapped loosely" around whatever was inside. While Ms. Frost did not see the object in the duffel bag, she knew that it was something metal because when the defendant pulled it out from underneath the bed, it hit the bed frame and "klinked." Ms. Frost testified that during the argument between Ms. Sheehan and the defendant, the defendant kept repeating, "Well, I'll blow you away. Get out of my apartment." The three women left because they didn't know what was in the bag and were afraid that they "might really get blown away."

Christy St. John also testified that Ms. Sheehan and the defendant had been arguing and that the defendant had pointed the duffel bag at Ms. Sheehan's face while threatening to "blow her away" 10 or 12 times. When the three women realized that there might be something in the bag that would harm them, they left at Ms. St. John's suggestion.

Carbondale police officer Randy Cory testified that he went to the defendant's apartment on October 19, 1982, to investigate an aggravated assault complaint. He was joined by Officer Mike Van Milligan,

and the two officers were allowed into the apartment by the defendant. In response to their questions, she stated that she did not have a gun. Upon searching the apartment, Officer Cory found the duffel bag under the bed and opened it, retrieving the sawed-off shotgun inside. The officer asked the defendant if the gun was hers, and the defendant stated no, that it was her boyfriend's. When asked how the gun had gotten under the bed in her apartment, she said that her boyfriend had put it there. Officer Cory testified that when he found the bag in the apartment, the bag was zipped and its contents were not visible.

As the final witness for the State, Officer Van Milligan testified that he interviewed the defendant at the police station after the gun had been found in her apartment. The defendant told him at that time that she knew there was some sort of gun in the bag but that she thought it was a "BB" gun. The defendant also stated that she had not pointed the bag containing the gun at anyone and that, during the argument with Ms. Sheehan, she had reached down under the bed to get the gun but had not stood up with it.

Kevin Simmons testified for the defense that in October 1982 he sometimes lived with the defendant in her apartment and that he kept several personal items there. Approximately two weeks before the incident, he had brought the blue duffel bag containing the shotgun into the apartment and placed it under the bed. The bag was zipped when he brought it into the apartment and, so far as he knew, the gun remained in the bag for the entire time it was there. Mr. Simmons told the defendant that there was a gun inside the bag and that it was a rifle, but he did not show the gun to her and had not seen the defendant unzip the bag or look inside it.

The defendant, testifying on her own behalf, stated that she first saw the bag under the bed the day after Mr. Simmons brought it into the apartment. Simmons had told her there was a gun in the bag, but she had never unzipped the bag and did not know what a shotgun was.

The defendant testified further that during the incident in question, Ms. Sheehan pointed her finger in the defendant's face while she and the two other young women surrounded her. When they refused to leave after repeated requests, the defendant backed away and went over to the bed where she lifted the covers up and reached for the duffel bag. She did not take it out from underneath the bed, although the three women could see it from where they stood. At that point the other two young women told Ms. Sheehan to "come on" and the three women left quickly.

The defendant stated that she knew very little about guns and that, although she knew that there was a gun in the bag, she was not going to do anything with it.

At the close of the evidence the defendant was found guilty of both the offenses of unlawful use of weapons and aggravated assault. A sentencing hearing was held at which the court, after reviewing the defendant's presentence investigation report and receiving information as to the defendant's current employment and academic status, sentenced the defendant to 12 months' probation on each count, to be served concurrently, and imposed a fine of $100.

■ On appeal from her conviction and sentence, the defendant contends initially that she was not proved guilty of "knowingly" possessing an illegal weapon where the evidence failed to show that she was aware of the illegal status and character of the sawed-off shotgun. The statute regarding the offense of unlawful use of weapons states in pertinent part:

> "A person commits the offense of unlawful use of weapons when he knowingly:
>
> * * *
>
> (7) Sells, manufactures, purchases, possesses or carries * * * any shotgun having one or more barrels less than 18 inches in length, sometimes called a sawed-off shotgun * * *." Ill. Rev. Stat. 1981, ch. 38, par. 24—1(a)(7).

The defendant does not dispute that the gun found in her apartment was a "sawed-off" shotgun as prohibited by the statute nor that the element of possession was satisfied, since the testimony established that the gun had been in her apartment and that she had picked up the bag, and therefore the enclosed gun, and pointed it at the three complaining witnesses. The defendant asserts, however, that the statute requires not only that she have knowledge of the presence of the gun but also that she have knowledge of its illegal status and character. While the defendant admitted at trial that she knew there was a gun in the bag, she maintains that she did not know that it was a sawed-off shotgun or that such a gun was illegal. Thus, since the evidence failed to prove her knowledge of the nature and illegal status of the gun, the defendant asserts that her conviction on the unlawful-use-of-weapons charge must be reversed.

We are aware of no other case involving the issue of whether the knowledge element of section 24—1(a)(7) may be satisfied by showing knowledge of the presence of a weapon which later proves to be illegal or whether it is necessary to show that the defendant had knowledge of the status and character of the illegal weapon. As pointed out

by the State, it is well settled that one is presumed to know the law and that ignorance of the law is no excuse. (*People v. Dean* (1979), 73 Ill. App. 3d 501, 392 N.E.2d 57; see Ill. Rev. Stat. 1981, ch. 38, par. 4—3(c).) Thus, it was not necessary to the defendant's conviction that the State prove the defendant knew that possession of a sawed-off shotgun was illegal. Since it is "knowing possession" of an illegal object that is proscribed by statute, the State was not required to prove that the defendant knew her possession was illegal but only that she knew she possessed the object in question.

■ The defendant contends, however, that the State was required to prove that she knew the nature of the gun she possessed—that is, that it was a sawed-off shotgun. The State argues in response that such a requirement would place the focus on the character of the accused rather than on the character of the weapon and would be contrary to the purpose of the statute to prohibit the use of sawed-off shotguns (see *People v. Stankovich* (1974), 20 Ill. App. 3d 162, 313 N.E.2d 276). It is a primary rule of statutory construction to ascertain and give effect to legislative intent, and, in ascertaining this intent, the entire statute must be considered and also "the evil to be remedied and the object to be attained." (*People v. Bratcher* (1976), 63 Ill. 2d 534, 543, 349 N.E.2d 31, 35.) As the *Stankovich* court observed, the legislature, in providing criminal liability for the mere possession of a sawed-off shotgun, recognized that such weapons are so inherently dangerous to human life that they constitute a hazard to society. The court held, therefore, under the forfeiture statute there involved (Ill. Rev. Stat. 1971, ch. 38, par. 24—6), that a sawed-off shotgun constituted contraband *per se* and could be confiscated and destroyed regardless of whether the defendant had been convicted on the underlying charge of unlawful use of weapons. By analogy, because of the inherently dangerous nature of sawed-off shotguns and their illegal status *per se,* we do not believe the legislature intended that the unlawfulness of the defendant's possession here should depend upon her familiarity or lack of familiarity with the characteristics of the gun she possessed. Rather, it was sufficient for the defendant's conviction that she have knowledge that she possessed the gun in question, which, because of its dangerous capacity, was the subject of legislative enactment.

The case of *People v. Davis* (1977), 50 Ill. App. 3d 163, 365 N.E.2d 1135, cited by the defendant, provides no support for her contention that knowledge of the illegal character of the weapon was required for conviction under section 24—1(a)(7). The defendant in *Davis* was charged with unlawful use of weapons after a sawed-off

shotgun was found under the seat of a car which he and the driver had borrowed to get a ride home. In the absence of evidence that the defendant knew the gun was present in the car, the court held that while the element of possession could be inferred from the defendant's general proximity to the weapon, such constructive possession could not support a further inference that the defendant knew of the weapon's presence in the car. The court stated:

"To establish defendant's guilt the State was required to prove *** not only that defendant was in possession of the shotgun, but also that his possession was knowing. Defendant's knowledge that the gun was in the car is essential to establish a crime. [Citations.] Without proof of such knowledge, individuals could be convicted of an offense for their mere inadvertent presence in a vehicle in which a prohibited weapon was found." (50 Ill. App. 3d 163, 167, 365 N.E.2d 1135, 1138.)

Thus, while it was necessary to show the defendant's knowledge of the presence of the weapon (see also *People v. McKnight* (1968), 39 Ill. 2d 577, 237 N.E.2d 488; *People v. Janis* (1977), 56 Ill. App. 3d 160, 371 N.E.2d 1063), there was no requirement in *Davis* that the defendant also be shown to have knowledge of the nature of the gun.

■ In the instant case the defendant's conviction was based, not upon her "inadvertent presence" near the gun, but upon her knowing possession of the gun. The defendant's actions concerning the gun here indicate that she was aware of the gun and its dangerous potential. In addition to the fact that the defendant had been told there was a gun in the bag, the evidence showed that she lifted the bag out from underneath the bed with some difficulty, indicating a heavy object inside, and that, although the gun was enclosed within the nylon bag, one could feel the gun inside the bag. One of the witnesses testified that the gun "klinked" against the metal bedframe as the defendant pulled it out. The defendant then pointed the gun at the three young women in her apartment and threatened to "blow them away." Under these facts, the State's proof must be said to have come within the knowledge requirement set forth in *Davis*, and we accordingly so hold.

■ The defendant next contends that there was insufficient evidence that the alleged victims of the aggravated assault were in "reasonable apprehension of receiving a battery" and that her conviction for aggravated assault must therefore be reversed. In particular, the defendant asserts that since the gun in question was completely concealed from the view of the victims, they had "no idea" that a gun was being pointed at them and that the victims demonstrated their

lack of apprehension by not leaving for several minutes during which they repeated their demands for money.

The offense of aggravated assault is defined as an assault using a deadly weapon (Ill. Rev. Stat. 1981, ch. 38, par. 12—2(a)(1)), and an assault is committed when "[a person] engages in conduct which places another in reasonable apprehension of receiving a battery." (Ill. Rev. Stat. 1981, ch. 38, par. 12—1(a).) Whether an assault victim was in reasonable apprehension of receiving a battery is a question of fact. (*People v. Chrisopulos* (1980), 82 Ill. App. 3d 581, 402 N.E.2d 912; *People v. Harkey* (1979), 69 Ill. App. 3d 94, 386 N.E.2d 1151.) It has been held that the pointing of a gun at another person, within shooting distance, constitutes an assault, as it would be reasonable under the circumstances to fear that a battery was about to occur. (*People v. Preis* (1963), 27 Ill. 2d 315, 189 N.E.2d 254.) Moreover, where the evidence is otherwise sufficient to justify such a finding, it is not necessary that the victim of an aggravated assault actually see the weapon before he may be said to be in reasonable apprehension of receiving a battery. *People v. Chrisopulos* (1980), 82 Ill. App. 3d 581, 402 N.E.2d 912; *cf. People v. Preis* (1963), 27 Ill. 2d 315, 189 N.E.2d 254 (evidence of assault sufficient where defendant threatened "I'm going to shoot you" and placed her hand in bulging coat pocket).

Contrary to the defendant's assertion here that her alleged victims had "no idea" that there was a gun in the duffel bag, the testimony indicated a reasonable belief on the part of the three young women that there was a gun inside the bag. While the bag was never unzipped so that the victims could actually see the gun, the bag was nylon and it was "draped over" or "wrapped loosely" around something that was being pointed at them like a gun. The victims could tell that the object was heavy and had some bulk to it, unlike a broom or a stick, and that it was metal, since they heard it "klink" against the bedframe. The defendant's repeated threats to "blow [them] out of the house" while she was pointing the bag at Ms. Sheehan's face caused the young women to realize that "there [might] be something [in the bag] that could harm [them]." From this testimony, the trial court could conclude that the victims were aware that there was possibly a gun in the bag. The testimony of the three victims that they left because they "felt threatened" and ran to the police station also demonstrates their apprehension when they realized, after about three minutes, that the defendant could actually "blow them away" with the gun inside the bag. We believe the evidence was sufficient to support the defendant's conviction for aggravated assault, and we affirm the court's ruling to that effect.

■ The defendant contends finally that the trial court abused its discretion in ordering her to pay a fine without making inquiry as to her ability to do so. As noted by the defendant, the trial court is required, "[i]n determining the amount and method of payment of a fine," to consider the offender's financial resources and future ability to pay the fine. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—9—1(d)(1).) A specific finding of ability to pay is not necessary, as such finding is implicit in imposition of the fine where the trial court is aware of facts that support its determination. *People v. Bishop* (1980), 81 Ill. App. 3d 521, 401 N.E.2d 648.

■ In the instant case the defendant was ordered to pay a fine of $100 over a period of 11 months. The trial court was aware that, at the time of her first appearance, the defendant had a checking account with $100 in it. She had a steady work history and was employed at the time of sentencing at a Burger King restaurant, where she had an average take-home pay of $94 every two weeks. The defendant had no assets but had no liabilities either. (*Cf. People v. Oravis* (1980), 81 Ill. App. 3d 717, 402 N.E.2d 297 (imposition of $2,000 fine improper where accused had not completed high school and had bad work record, was working only part-time at time of sentencing, and had liabilities of $2,000).) While the defendant was paying her way through college by means of loans and grants, we believe the record supports the court's determination that she had the financial resources and future ability to pay the $100 fine over the course of 11 months. The fact that the defendant qualified for the services of the public defender does not mean that she would not be able to pay a $100 fine. (*People v. Mitchell* (1977), 52 Ill. App. 3d 745, 367 N.E.2d 1351.) As with any sentence, one of the purposes of a fine is punishment, and the fine should impress upon the defendant the seriousness of the offense and the necessity of discontinuing illegal actions. (*People v. Morrison* (1983), 111 Ill. App. 3d 997, 444 N.E.2d 1144 (Heiple, J., dissenting).) The trial court's decision to impose this fine as part of the defendant's sentence is entitled to great deference and weight (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882), and, from the record before us, we cannot say that the court abused its discretion.

For the reasons stated in this opinion, we affirm the judgment of the circuit court of Jackson County.

Affirmed.

HARRISON and WELCH, JJ., concur.