2022 IL App (4th) 210194

NO. 4-21-0194

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 20, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Woodford County |
| JaQUAY M. FIELDS, | ) | No. 19CF114 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Charles M. Feeney III, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court, with opinion.
Justices Harris and Cavanagh concurred in the judgment and opinion.

**OPINION**

¶ 1        On November 9, 2020, a jury found defendant, JaQuay M. Fields, guilty of

unlawful possession of a weapon with a revoked firearm owner's identification card (FOID card)

(430 ILCS 65/2(a)(1) (West 2018)). On January 7, 2021, the trial court sentenced defendant to two

years in prison with one year of mandatory supervised release (MSR). Defendant appeals, arguing

the trial court erred in denying her motion to suppress evidence found after an unlawful traffic

stop, the State failed to prove she was reckless in not knowing her FOID card had been revoked,

and, alternatively, the trial court erred when it barred defendant from presenting evidence she was

unaware of the revocation. We affirm.

¶ 2                              I. BACKGROUND

¶ 3        On July 17, 2019, the State charged defendant by information with unlawful

possession of a firearm without a valid FOID card citing section 2(a)(1) of the Firearm Owners

Identification Card Act (Act) (430 ILCS 65/2(a)(1) (West 2018)). On August 1, 2019, a grand jury indicted defendant on the same charge.

¶ 4        On November 8, 2019, defendant filed a motion to suppress the evidence recovered after her motor vehicle was stopped on July 6, 2019. According to the motion, the police claimed she was stopped because of her defective exhaust system. After reportedly smelling cannabis, the police officer searched defendant's vehicle and found the firearm at issue. Defendant argued the vehicle was not excessively loud and the police officer used the exhaust offense as a pretense to stop defendant's vehicle.

¶ 5        On December 19, 2019, the trial court held a hearing on defendant's motion to suppress. Defendant offered the following testimony. She was driving home from St. Louis on July 6, 2019, and was obeying the speed limit. Demetric Collum was a passenger in her vehicle. Both defendant and Collum are African American. When she first saw the police vehicle in the median of the interstate, she was in the lane furthest from the police officer and some other vehicles were about half of a mile in front of her on the interstate. The police officer began following her after she passed. The officer then switched lanes and drove up alongside her vehicle. She and the police officer looked at each other, and the officer then passed her. Shortly thereafter, defendant saw the officer again pulled over in front of an exit sign on the interstate. When she passed, the officer pulled her over.

¶ 6        The officer approached her vehicle on the passenger side and indicated he stopped defendant because of her vehicle's loud exhaust. The officer took both her and Collum's identification cards back to his police vehicle. When the officer came back to her car, he asked her about a restraining order she had against Collum. Defendant said the restraining order was never served on Collum. However, the officer indicated he could still arrest Collum. The officer then

asked Collum to exit the vehicle and asked defendant if anyone had been smoking marijuana in the car. She said no. Defendant told the officer she thought he only pulled her over because he wanted to search her vehicle. The officer then ordered her to get out of the car. Defendant complied but said she did not consent to a search of her vehicle.

¶ 7        The police officer began searching her car anyway, then handcuffed Collum, and then resumed his search. The officer then came back and questioned defendant about a handgun he found. Defendant answered the deputy's questions regarding what kind of gun was in the vehicle, what caliber it was, and who the gun belonged to. She told the officer she had a concealed carry license (CCL) and FOID card in her wallet. The officer found those cards and told her they were revoked. Defendant told the officer she did not know they were revoked. When the officer continued his search of the car, he found a piece of a blunt. Collum told the officer he had smoked in the car in St. Louis and the blunt was his.

¶ 8        The police officer confiscated defendant's handgun but eventually let her and Collum leave. Defendant indicated she never smelled marijuana in the car or noticed any excessive noise coming from the exhaust. After later receiving a notice of an arrest warrant, she turned herself into the authorities. Defendant stated she took her vehicle to Midas after the stop. Midas said no repairs were needed.

¶ 9        The State then called Woodford County Sheriff's Deputy Nathan Campbell, who testified he was watching northbound traffic in the median of Interstate 39 between 7:30 p.m. and 9 p.m. on July 6, 2019. Deputy Cole Mekley was with Deputy Campbell. When defendant's vehicle passed, he noticed the vehicle's excessive exhaust noise—which indicated a problem with the factory exhaust system—and defendant's "jubilant singing." Defendant was not speeding, and no other vehicles were in the immediate vicinity of defendant traveling north. Deputy Campbell

wanted to develop the situation more based on what he observed, so he caught up with defendant's vehicle. He drove up to the side of the vehicle, confirmed the exhaust violation, and then monitored the vehicle's actions. The following exchange occurred between the prosecutor and Deputy Campbell regarding what was different about defendant's vehicle:

"A. It was loud. I typically don't hear a vehicle's exhaust even traveling on the highway.

Q. And could you—was this an unusual sound coming from this make and model of car?

A. Yes, sir.

Q. Have you had the experience with this, like Ford SUVs such as what you were pulling over?

A. Yes, sir.

Q. Okay. Was this exhaust system louder than other vehicles you have come into contact that are even 2008 Ford SUVs?

A. Yes, sir."

After passing defendant, he kept watching her in his rearview mirror. He slowed down to between 55 and 65 miles per hour to see if the vehicle would catch up to him. It did not.

¶ 10        After considering the circumstances, Deputy Campbell decided to stop defendant, so he pulled over and waited for her to pass. When defendant's vehicle passed, Deputy Campbell could still hear the loud exhaust, and he stopped defendant. Deputy Campbell and Deputy Mekley approached the passenger side of defendant's vehicle. Deputy Campbell asked defendant for her driver's license and insurance and Collum for his name and date of birth. Deputy Campbell determined defendant had an order of protection against Collum and understood the order had been

served on Collum. Deputy Campbell had Collum exit the vehicle. Deputy Campbell then spoke with defendant and smelled burnt cannabis in the vehicle. Defendant denied any marijuana had been smoked in the vehicle. Collum later admitted he had smoked marijuana in the vehicle a few hours earlier.

¶ 11     Deputy Campbell then searched the vehicle and found a small blunt, which smelled like cannabis, and a 9-millimeter pistol. Deputy Campbell immediately put handcuffs on Collum, who Deputy Campbell knew was on parole. Deputy Campbell then spoke with defendant about the pistol to determine who owned it and whether she knew it was in the vehicle. According to Deputy Campbell, defendant hesitated before saying a firearm might be in the vehicle. She then described the firearm and said it was hers. Deputy Campbell then determined defendant's FOID card and CCL were revoked. Deputy Campbell seized the firearm but allowed defendant and Collum to leave the scene. He did not cite defendant for operating a vehicle with a loud exhaust nor write a warning citation. When asked why he pulled the vehicle over initially, Deputy Campbell testified, "The legal cause was for the exhaust violation."

¶ 12     On cross-examination, Deputy Campbell said defendant's vehicle was just cruising along, not accelerating, when he first saw it. He heard noise coming from the vehicle that was different than normal engine noise. He described what he heard as follows:

> "In the engine I—it's been a long-time hobby of mine, and that's even how I addressed it with her, is you could tell almost from the gurgling sound that—it sounded as a leak that would be close to the manifold as if the header or that manifold was leaking, or maybe the gasket had come loose from the motor there. It's a gurgling, loud noise that you get when it's that close to the motor."

Deputy Campbell said the noise would be present when the vehicle was cruising but would

increase with acceleration. He did not have any kind of sound meter or other device to measure the decibel level of the vehicle. Deputy Campbell said he started following defendant's car because it "piqued" his interest based on the exhaust, the driver singing, and the vehicle's window being halfway down.

¶ 13　　　　Deputy Campbell conceded the window being down was not notable in a legal sense. When asked why a person singing would draw his attention or be worth investigating, Deputy Campbell responded:

> "There's different things that I've noticed in my experience doing the job and as well that I've been trained to. Singing is one of those things. Oftentimes you will see somebody stretching as they pass in front of me. The stretching, the yawning, the singing is all something done that they feel pressure on them because the police officer is sitting there knowing they're looking. And all of those things are done by that subject to make it look as if they're relaxed. I'm not concerned about you. I'm okay. I'm an innocent person traveling down the road. I'm just relaxing, singing. When, quite oppositely, I sing. I sing in a band. But when I stop at the red light in Peoria and I'm singing alone in my truck and I know that people are watching me I stop singing. Most people don't enjoy being watched singing. I watch thousands of cars a day going down the highway. Very rare for me to see somebody singing jubilantly."

¶ 14　　　　Defense counsel argued the stop was unlawful because defendant's car was not excessively noisy. Deputy Campbell relied only on his own ears and did not use any kind of mechanical or sound test. Further, defendant had the vehicle's exhaust tested after the fact and no problems were detected. Counsel argued everything found after the illegal stop was the fruit of the

unlawful stop. The State argued Deputy Campbell made a lawful stop based on the vehicle's loud exhaust.

¶ 15    The trial court stated the video evidence showed it was obvious defendant's vehicle had an exhaust problem. The court placed little weight on defendant's assertion about the Midas vehicle examination because the vehicle could have been repaired before it was taken to Midas. The court also indicated "the video is really clear there was an exhaust problem here. And you particularly hear it, overwhelmingly clearly hear it, when the defendant revs the engine. But that happens later."

¶ 16    The trial court indicated Deputy Campbell pulled out and started following defendant based on a hunch but pulled up near the vehicle and heard the exhaust more clearly. Deputy Campbell then passed the vehicle and then slowed down to see if defendant would pass him, which she did not do. Deputy Campbell then pulled over. When defendant passed, Deputy Campbell pulled defendant over. The court found the officer had articulable suspicion because the officer could hear the exhaust. The court denied the motion to suppress, stating the "officer was doing what he was supposed to be doing. He didn't violate any constitutional rights that I've heard yet of the defendant's."

¶ 17    At defendant's trial, Deputy Campbell testified he noticed a leak in defendant's exhaust was "producing excessive noise" when it passed him. He testified the vehicle was louder than the other traffic around it. He pulled the vehicle over because of the loud exhaust. With regard to the reason for the stop, the State and Deputy Campbell had the following exchange:

"Q. Could you describe the sound that was coming from that vehicle that first drew your attention to it?

A. It's just that gurgling sound that usually you hear when the gasket is

leaking up at the manifold of the engine, so the header or the exhaust manifold from the motor. Typically it makes a lot of noise if you have a hole in the muffler, or something. But once you get up close to the cylinder you almost hear, like, a gurgle with it. It's just—it's difficult to hear in the video from the speakers today. But if you're able to watch this, pretty doggone obvious. Probably on a sound level I would say somewhere around maybe a motorcycle level of noise.

Q. Okay. Louder than the normal car in your experience of doing traffic enforcement?

A. Absolutely."

¶ 18 During the stop, he found defendant had an order of protection against her passenger, Collum. He also smelled cannabis in the vehicle. After smelling the cannabis, he searched the vehicle and found a firearm. Defendant said the weapon was hers and described it for the officer. She also indicated she had a FOID card and a CCL. Deputy Campbell determined defendant's FOID card had been revoked. As a result, he confiscated her handgun.

¶ 19 Deputy Campbell did not arrest either defendant or Collum. He offered to give Collum a ride to a gas station so he could call and get a different ride home. Deputy Campbell warned Collum another officer could arrest him for being in violation of defendant's order of protection. Collum declined the offered ride and left with defendant. Deputy Campbell indicated he prepared a report regarding the encounter and sent it to the state's attorney.

¶ 20 Jon Achas, who worked for the Illinois State Police, testified he was in the investigative section of the Firearm Services Bureau. Achas testified defendant's FOID card was revoked as of April 21, 2019. On July 6, 2019, defendant did not have a valid FOID card or a CCL, which was revoked on April 24, 2019. Achas testified a notice of revocation is mailed to the holder

of the FOID card when the card is revoked. Any notices for defendant would have been mailed to defendant at a Plano, Illinois, address.

¶ 21        The State rested after Achas testified. Based on a conversation the prosecutor had had with defense counsel, the State then made an oral motion *in limine* asking the trial court to prohibit defendant from testifying she did not know her FOID card had been revoked. According to the State, the law did not require defendant to know of the revocation to be guilty of the offense. The court granted the motion *in limine*, concluding "knowledge of the revocation is not an element and is, therefore, not relevant. So whether she received notice, that is not an issue the jury is required to decide." However, the court also stated, "in this instance[,] I think they also have to prove that the FOID card was revoked, because that's an aggravating factor. So that will have to be an additional element submitted to the jury."

¶ 22        Defense counsel indicated defendant had planned to testify she was never notified either her FOID card or CCL had been revoked. However, because of the trial court's ruling on the State's motion *in limine*, defense counsel said defendant had no evidence to present. Defense counsel did not ask the trial court to allow defendant to testify outside the presence of the jury as part of an offer of proof.

¶ 23        The jury found defendant guilty.

¶ 24        At the January 2021 sentencing hearing, defendant testified she did not know her FOID card and CCL had been revoked when she was stopped and would not have been carrying the firearm had she known of the revocation. The State indicated defendant was convicted of a non-probationable offense with a sentencing range between two and five years in the Illinois Department of Corrections. See 730 ILCS 5/5-5-3(c)(2)(N) (West 2018). The State asked for a 40-month prison sentence. The trial court sentenced defendant to the statutory minimum, which was

two years in prison. The court explained he would have given defendant probation or conditional discharge if he could.

¶ 25    Defendant filed neither a posttrial motion nor a motion to reconsider sentence. On January 21, 2021, more than 30 days after the jury found her guilty and after she was sentenced, defendant filed a motion to reconsider the ruling on the motion to suppress. On April 8, 2021, the trial court denied defendant's motion to reconsider and directed its clerk to file a notice of appeal on defendant's behalf, appointing the Office of the State Appellate Defender to represent defendant on appeal. On June 4, 2021, this court allowed defendant's motion for leave to file a late notice of appeal.

¶ 26                                II. ANALYSIS

¶ 27    On appeal, defendant argues the trial court erred by denying her motion to suppress evidence, the State failed to prove her guilt beyond a reasonable doubt, and, alternatively, the court erred when it barred defendant from presenting evidence she did not know her FOID card had been revoked. As will be explained *infra*, we also asked the parties to file supplemental briefs addressing an additional issue.

¶ 28                                A. Forfeiture

¶ 29    Defendant failed to properly preserve the issues she raised on appeal. To preserve an issue for appellate review, a party ordinarily must raise the issue during her trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988). Section 116-1(b) of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-1(b) (West 2018)) states: "A written motion for a new trial shall be filed by the defendant within 30 days following the entry of a finding or the return of a verdict." The jury reached its verdict in this case on November 9, 2020. Defendant failed to file a posttrial motion within 30 days after the jury's verdict. The trial court sentenced

defendant on January 7, 2021. On January 21, 2021, defendant filed a motion to reconsider the court's ruling on the motion to suppress, which the trial court denied on April 8, 2021. This appeal followed.

¶ 30   As a result, because defendant did not file a timely posttrial motion, the issues defendant raised on appeal are forfeited. Defendant argues we can still address the issues she raises on appeal regardless of forfeiture. We address her arguments with regard to each issue below.

¶ 31                                    B. Motion to Suppress

¶ 32   Defendant first argues the trial court erred in denying her motion to suppress, which claimed the police lacked reasonable suspicion to lawfully stop her vehicle and the evidence recovered was the fruit of the unlawful stop. Without this evidence, the State could not have proved its case.

¶ 33   As noted earlier, defendant forfeited this issue. Nonetheless, defendant argues we can still consider the issue by applying the "constitutional-issue exception" because (1) the constitutional issue was properly raised in the trial court, (2) the issue could be raised later in a postconviction petition, and (3) judicial resources would be wasted requiring defendant to raise the issue in a separate proceeding. *People v. Cregan*, 2014 IL 113600, ¶¶ 16, 18, 10 N.E.3d 1196 (citing *Enoch*, 122 Ill. 2d at 190). Defendant also argues we should find her counsel was constitutionally ineffective because he did not file a proper posttrial motion preserving this issue. Defendant does not argue we should review this issue pursuant to the plain-error doctrine.

¶ 34   Defendant's argument presents a constitutional issue that was properly raised at trial and could be later raised in a postconviction petition. As a result, we will review this issue pursuant to the constitutional-issue exception to forfeiture. As our supreme court has stated:

"If a defendant were precluded from raising a constitutional issue previously raised

- 11 -

at trial on direct appeal, merely because he failed to raise it in a posttrial motion, the defendant could simply allege the issue in a later postconviction petition. Accordingly, the interests in judicial economy favor addressing the issue on direct appeal rather than requiring defendant to raise it in a separate postconviction petition." *Cregan*, 2014 IL 113600, ¶ 18.

¶ 35 "When a defendant files a motion to suppress evidence, he bears the burden of proof at a hearing on that motion." *People v. Brooks*, 2017 IL 121413, ¶ 22, 104 N.E.3d 417. The defendant must establish a *prima facie* case the evidence in question was obtained as the result of an illegal search or seizure. *Brooks*, 2017 IL 121413, ¶ 22. A *prima facie* showing means the defendant has the primary responsibility for establishing the legal and factual bases for the motion to suppress. *Brooks*, 2017 IL 121413, ¶ 22. "If a defendant makes a *prima facie* case, the burden shifts to the State to present evidence to counter the defendant's *prima facie* case. [Citation.] However, the ultimate burden of proof remains with the defendant." *Brooks*, 2017 IL 121413, ¶ 22.

¶ 36 The question here is whether Deputy Campbell had reasonable articulable suspicion to stop defendant's vehicle. A challenge to the denial of a motion to suppress entails a two-part standard of review. *Brooks*, 2017 IL 121413, ¶ 21. "Under this standard, a circuit court's factual findings are reversed only if they are against the manifest weight of the evidence, while the court's ultimate legal ruling as to whether suppression is warranted is reviewed *de novo*." *Brooks*, 2017 IL 121413, ¶ 21.

¶ 37 A citizen has the right to be free from unreasonable searches and seizures under both the United States and Illinois Constitutions. U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, § 6. "The cornerstone of the fourth amendment is reasonableness, which seeks to balance the interest in according discretion in enforcing the law for the community's protection and

safeguarding against invasions of citizens' privacy." *People v. Hill*, 2020 IL 124595, ¶ 19, 162 N.E.3d 260. For purposes of the fourth amendment, reasonableness normally requires a warrant supported by probable cause. *People v. Love*, 199 Ill. 2d 269, 275, 769 N.E.2d 10, 14 (2002).

¶ 38 However, a police officer may conduct a brief, investigatory stop of an individual if the officer has a reasonable belief the individual has committed or is about to commit a crime. *People v. Timmsen*, 2016 IL 118181, ¶ 9, 50 N.E.3d 1092 (citing *Terry v. Ohio*, 392 U.S. 1, 22 (1968)). According to our supreme court:

> "The officer must have a 'reasonable, articulable suspicion' that criminal activity is afoot. [Citation.] Although 'reasonable, articulable suspicion' is a less demanding standard than probable cause, an officer's suspicion must amount to more than an 'inchoate and unparticularized suspicion or "hunch" ' of criminal activity. [Citation.] The investigatory stop must be justified at its inception and the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the governmental intrusion upon the constitutionally protected interests of the private citizen. [Citation.] In judging the officer's conduct, we apply an objective standard and consider, 'would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?' [Citation.] Further, when evaluating the validity of the stop, we consider ' "the totality of the circumstances—the whole picture." ' [Citation.]" *Timmsen*, 2016 IL 118181, ¶ 9.

The standard established in *Terry* has been codified into Illinois law at section 107-14 of the Code of Criminal Procedure of 1963 (725 ILCS 5/107-14 (West 2018)).

¶ 39         Our supreme court has stated "[v]ehicle stops are subject to the fourth amendment's reasonableness requirement." *People v. Hackett*, 2012 IL 111781, ¶ 20, 971 N.E.2d 1058. When a police officer has probable cause to believe a traffic offense has occurred, the decision to stop a vehicle is reasonable. *Hackett*, 2012 IL 111781, ¶ 20. However, a police officer does not have to have probable cause a traffic violation has occurred to stop a vehicle. *Hackett*, 2012 IL 111781, ¶ 20. "A police officer may conduct a brief, investigatory stop of a person where the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Hackett*, 2012 IL 111781, ¶ 20. "The distinction between these two standards may or may not be relevant, depending upon the facts of the case under consideration and the Vehicle Code provisions at issue." *Hackett*, 2012 IL 111781, ¶ 20.

¶ 40         At the suppression hearing, Deputy Campbell testified he stopped defendant's vehicle because the exhaust system on her vehicle was defective. According to Deputy Campbell, the vehicle was very loud. While not making an explicit finding, the trial court apparently determined Deputy Campbell's testimony was credible and also found the vehicle's exhaust system was loud. Based on this record, the court's findings are not against the manifest weight of the evidence.

¶ 41         Section 12-602 of the Illinois Vehicle Code (625 ILCS 5/12-602 (West 2018)) states:

> "Every motor vehicle driven or operated upon the highways of this State shall at all times be equipped with an adequate muffler or exhaust system in constant operation and properly maintained to prevent any excessive or unusual noise. No such muffler or exhaust system shall be equipped with a cutout, bypass or similar device. No person shall modify the exhaust system of a motor vehicle in a manner which will

amplify or increase the noise of such vehicle above that emitted by the muffler originally installed on the vehicle, and such original muffler shall comply with all the requirements of this Section."

Defendant acknowledges in her brief that if Deputy Campbell was not mistaken regarding the noise coming from defendant's vehicle, or even if he was mistaken but the mistake was reasonable, Deputy Campbell would have had reasonable suspicion to stop defendant based on a violation of section 12-602 of the Vehicle Code (625 ILCS 5/12-602 (West 2018)).

¶ 42       Defendant points to the State's argument at trial that the best evidence in this case is the video of what occurred after Deputy Campbell stopped defendant. However, the trial court also relied on the deputy's testimony regarding why he stopped defendant's car, and as we have noted, the trial court must have found the deputy's testimony credible. As a reviewing court, we will not disturb the court's credibility determination. Further, the video does not refute Deputy Campbell's testimony regarding the noise defendant's vehicle was making on the interstate while the vehicle was driving at a speed of 70 miles per hour.

¶ 43       Defendant also argues this was a pretextual stop, and Deputy Campbell pulled defendant over for a trivial reason contradicted by the video evidence. However, as we stated above, the video does not contradict Deputy Campbell's testimony regarding the noise defendant's vehicle was making while going 70 miles per hour on the highway. Further, while defendant considers a violation of section 12-602 of the Vehicle Code (625 ILCS 5/12-602 (West 2018)) to be a trivial reason to stop defendant's vehicle, she provides no real analysis why Deputy Campbell could not pull her over for a violation of that section.

¶ 44       Finally, defendant's appellate counsel implicitly argues Deputy Campbell pulled over defendant because she was African American. Citing concurring opinions by Justice Ginsburg

in *Arkansas v. Sullivan*, 532 U.S. 769, 773 (2001), and in *District of Columbia v. Wesby*, 583 U.S. ___, ___, 138 S. Ct. 577, 594 (2018), defendant argues courts should sometimes break with the normal rule and consider an officer's subjective motivations for making a stop. However, defendant points to no evidence Deputy Campbell stopped defendant for any reason other than that he had reasonable suspicion based on specific articulable facts defendant was violating section 12-602 of the Vehicle Code (625 ILCS 5/12-602 (West 2018)).

¶ 45　　　　Under our standard of review, we will not reverse a trial court's ruling on a motion to suppress based on an implied and unsupported allegation Deputy Campbell stopped defendant because she was African American. While the stop does seem unusual, and we are mindful of the perverseness of racial profiling, no evidence was submitted to the trial court which suggested Deputy Campbell pulled defendant over because she was black.

¶ 46　　　　　　　　　　　　　　C. Valid FOID Card

¶ 47　　　　After reviewing the record in this case and section 2(a)(1) of the Act (430 ILCS 65/2(a)(1) (West 2018)) and the pattern jury instructions for a charged violation of section 2(a)(1), we ordered the parties to each file a supplemental brief addressing whether an individual could be convicted of violating section 2(a)(1) if she had in her possession a FOID card previously issued in her name by the Department of State Police that was not invalid on its face even though it was revoked.

¶ 48　　　　The precise language of section 2(a)(1) states: "No person may acquire or possess any firearm, stun gun, or taser within this State without having in his or her possession a [FOID] Card previously issued in his or her name by the Department of State Police under the provisions of this Act." 430 ILCS 65/2(a)(1) (West 2018). However, defendant was not charged with possession of a firearm without having in her possession a FOID card previously issued in her

name by the State Police. Instead, the State charged defendant with violating section 2(a)(1) of the Act (430 ILCS 65/2(a)(1) (West 2018)) by possessing a firearm without a valid FOID card because her FOID card was revoked.

¶ 49        In her supplemental brief, defendant argues her FOID card, although revoked, was in her possession at the time she possessed the firearm. Thus, according to defendant, she did not violate section 2(a)(1) of the Act (430 ILCS 65/2(a)(1) (West 2018)) because she had in her possession a FOID card previously issued in her name by the Department of State Police.

¶ 50        In its supplemental brief, the State argues section 2(a)(1) should not be read in isolation but, instead, should be construed together with the section 14 sentencing provisions of the Act (430 ILCS 65/14 (West 2018)). According to the State, when considering those sections together, possession of a revoked FOID card is irrelevant because section 2(a)(1) contemplates possession of a "valid" FOID card previously issued to the holder. We note the supreme court in *dicta* has stated "[a] person who acquires or possesses a firearm without also possessing a *valid* FOID card violates the FOID Card Act." (Emphasis added.) *People v. Williams*, 2015 IL 117470, ¶ 14, 43 N.E.3d 941.

¶ 51        The primary purpose in interpreting a statute is to ascertain and make effectual the intent of the legislative body. *People v. Harvey*, 2018 IL 122325, ¶ 26, 115 N.E.3d 172. All laws should be sensibly interpreted so as not to produce an absurd result contrary to obvious legislative intent. *Harvey*, 2018 IL 122325, ¶ 26. "A court must view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation." *People v. Casler*, 2020 IL 125117, ¶ 24, 181 N.E.3d 767. Moreover, courts " 'will not hesitate to read into the sense of some section or provision a qualifying or expanding expression plainly implied by the general context of the act, which has been palpably omitted and which is necessary to prevent the

legislative purpose from failing in one of its material aspects.' " *In re S.B.*, 2012 IL 112204, ¶ 28, 977 N.E.2d 144 (quoting *People ex rel. Barrett v. Anderson*, 398 Ill. 480, 485, 76 N.E.2d 773 (1947)).

¶ 52        As pertinent to this appeal, the section 14 sentencing provisions state as follows:

"(a) Except as provided in subsection (a-5), a violation of paragraph (1) of subsection (a) of Section 2, when the person's [FOID] Card is expired but the person is not otherwise disqualified from renewing the card, is a Class A misdemeanor.

(a-5) A violation of paragraph (1) of subsection (a) of Section 2, when the person's [FOID] Card is expired but the person is not otherwise disqualified from owning, purchasing, or possessing firearms, is a petty offense if the card was expired for 6 months or less from the date of expiration.

(b) Except as provided in subsection (a) with respect to an expired card, a violation of paragraph (1) of subsection (a) of Section 2 is a Class A misdemeanor when the person does not possess a currently valid [FOID] Card, but is otherwise eligible under this Act. A second or subsequent violation is a Class 4 felony.

(c) A violation of paragraph (1) of subsection (a) of Section 2 is a Class 3 felony when:

(1) the person's [FOID] Card is revoked or subject to revocation under Section 8; or

(2) the person's [FOID] Card is expired and not otherwise eligible for renewal under this Act; or

(3) the person does not possess a currently valid [FOID] card, and

- 18 -

the person is not otherwise eligible under this Act." 430 ILCS 65/14(a), (a-5), (b), (c)(1)(2)(3) (West 2018).

¶ 53    Although it is indisputable section 2(a)(1) does not include the word "valid," section 14 of the Act does so twice. A plain reading of section 14 demonstrates the legislature has set forth penalties for violations of section 2(a)(1) for offenders who have never been issued a FOID card and separate penalties for offenders who have been issued FOID cards that are no longer valid.

¶ 54    Section 14(b) provides that an offender under section 2(a)(1) who does not possess a currently valid FOID card, but is otherwise eligible to obtain one, is guilty of a Class A misdemeanor, with a second violation being a Class 4 felony. However, if an offender does not possess a currently valid FOID card and is not eligible to obtain one, section 14(c)(3) elevates the offense to a Class 3 felony. Sections 14(a) and 14(a-5) also address different penalties for offenders whose FOID cards are no longer valid because the cards have expired. Finally, and relevant to this case, section 14(c)(1) of the Act (430 ILCS 65/14(c)(1) (West 2018)) provides that an offender whose FOID card has been revoked—and is therefore no longer valid—is guilty of a Class 3 felony.

¶ 55    The legislature's sentencing structure in section 14 does not attach any relevance to a person retaining possession of invalid cards. We further note failing to surrender a revoked FOID card after receiving notice of the revocation is a Class A misdemeanor under section 9.5 of the Act (430 ILCS 65/9.5 (West 2018)). Additionally, in its supplemental brief, the State posits the General Assembly could not have intended for a person in defendant's position to be exonerated under the statute because she carried her revoked card with her but be in violation of the Act if she had instead left her revoked card at her home. We agree.

¶ 56　　　　　We also find the State's citation to *People v. Larson*, 2015 IL App (2d) 141154, 40 N.E.3d 795, persuasive. In *Larson*, the defendant was charged with violating section 2(a)(1), a Class 3 felony because he possessed a firearm and his previously issued FOID card was revoked. *Larson*, 2015 IL App (2d) 141154, ¶ 1. In analyzing the Act's sentencing provisions, the *Larson* court considered the interplay of sections 14(b), 14(c)(1), and 14(c)(3) (430 ILCS 65/14(b), (c)(1), (3)) (West 2018)). *Larson*, 2015 IL App (2d) 141154, ¶ 6. The court concluded:

> "It was the General Assembly's prerogative to determine what penalties to attach to different categories of violations. Based on the structure and language of the Act and its sentencing scheme, it is evident that the General Assembly concluded that possession of firearms after revocation of one's FOID card represents a greater public-safety threat than the mere failure to apply for a card." *Larson*, 2015 IL App (2d) 141154, ¶ 8.

We agree with *Larson*'s analysis and believe our analysis in this case is consistent with it.

¶ 57　　　　　　　　　　　D. Sufficiency of Evidence to Convict

¶ 58　　　　　We next address defendant's argument the State failed to produce evidence sufficient to convict her of possessing a firearm with a revoked FOID card. According to defendant, the trial court erred in concluding the State did not have to establish a mental element with regard to her FOID card being revoked. Defendant contends section 2(a)(1) of the Act (430 ILCS 65/2(a)(1) (West 2018)) does not impose absolute liability on a defendant who is in possession of a firearm with a revoked FOID card.

¶ 59　　　　　Defendant forfeited this argument because she did not file a timely posttrial motion. However, defendant argues in her brief she objected to the State's motion *in limine* barring her from introducing evidence she did not know her FOID card had been revoked and argues we can

- 20 -

consider this issue pursuant to either the constitutional-issue exception discussed earlier or the plain-error doctrine.

¶ 60    We can consider a forfeited issue by applying the "constitutional-issue exception" if (1) the constitutional issue was properly raised in the trial court, (2) the issue could be raised later in a postconviction petition, and (3) judicial resources would be wasted requiring defendant to raise the issue in a separate proceeding. *Cregan*, 2014 IL 113600, ¶¶ 16, 18 (citing *Enoch*, 122 Ill. 2d at 190). The constitutional-issue exception does not apply in this situation.

¶ 61    The State filed a motion *in limine* asking the trial court to find defendant could not testify she did not know her FOID card had been revoked. However, defense counsel never argued the legislature did not intend a violation of section 2(a)(1) of the Act (430 ILCS 65/2(a)(1) (West 2018)) to be an absolute liability or strict liability offense. Based on the record before this court, it does not appear either the term "absolute liability" or "strict liability" was used during any hearing or the trial.

¶ 62    Defendant also asserts we can consider her argument under plain error. The plain-error doctrine allows a reviewing court to consider a forfeited error when

> "(1) a clear or obvious error occur[s] and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occur[s] and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007).

The first step in obtaining relief under the plain-error doctrine is for the defendant to show a clear

or obvious error occurred. *People v. Hillier*, 237 Ill. 2d 539, 545, 931 N.E.2d 1184, 1187 (2010). Thus, we first address whether defendant established the trial court committed a clear or obvious error when it determined the State did not have to prove defendant's mental state with regard to her FOID card being revoked.

¶ 63 Defendant argues when, as here, a statute does not prescribe a mental state for each element of an offense, courts must defer to the default rules established by the legislature. Section 4-3(a) of the Criminal Code of 2012 (720 ILCS 5/4-3(a) (West 2018)) states: "A person is not guilty of an offense, other than an offense which involves absolute liability, unless, with respect to each element described by the statute defining the offense, he acts while having one of the mental states described in Sections 4-4 through 4-7." Those mental states are intent (720 ILCS 5/4-4 (West 2018)), knowledge (720 ILCS 5/4-5 (West 2018)), recklessness (720 ILCS 5/4-6 (West 2018)), or negligence (720 ILCS 5/4-7 (West 2018)). Section 4-9 of the Criminal Code of 2012 states:

> "A person may be guilty of an offense without having, as to each element thereof, one of the mental states described in Sections 4-4 through 4-7 if the offense is a misdemeanor which is not punishable by incarceration or by a fine exceeding $1,000, or the statute defining the offense clearly indicates a legislative purpose to impose absolute liability for the conduct described." 720 ILCS 5/4-9 (West 2018).

¶ 64 According to defendant, the Act does not clearly indicate a legislative purpose to impose absolute liability and her offense is a felony rather than a misdemeanor. Thus, defendant argues the State had to prove defendant knew her FOID card was revoked or—at a minimum— was reckless for not being aware of the revocation.

¶ 65 The State argues the legislative declaration in section 1 of the Act (430 ILCS 65/1

(West 2018)) indicates the General Assembly's purpose to impose absolute liability. Section 1 states:

> "It is hereby declared as a matter of legislative determination that in order to promote and protect the health, safety and welfare of the public, it is necessary and in the public interest to provide a system of identifying persons who are not qualified to acquire or possess firearms, firearm ammunition, stun guns, and tasers within the State of Illinois by the establishment of a system of Firearm Owner's Identification Cards, thereby establishing a practical and workable system by which law enforcement authorities will be afforded an opportunity to identify those persons who are prohibited by section 24-3.1 of the Criminal Code of 2012, from acquiring or possessing firearms and firearm ammunition and who are prohibited by this Act from acquiring stun guns and tasers." 430 ILCS 65/1 (West 2018).

The State also compares a violation of section 2(a)(1) with driving under the influence (DUI) (625 ILCS 5/11-501 (West 2018)) and driving while license suspended or revoked (625 ILCS 5/6-303 (West 2018)), which are both strict liability offenses.

¶ 66    We find no merit in the State's argument and agree with defendant the Act does not prescribe a strict or absolute liability crime. Although section 2(a)(1) refers to no mental state, it is clear the State was required to prove defendant knowingly possessed a firearm to be guilty of the offense charged. The State nor defendant argue otherwise. As such, a culpable mental element was required to prove defendant guilty, and " '[a]n absolute liability offense is one which does not require a culpable mental state as an element.' " *People v. Laws*, 2016 IL App (4th) 140995, ¶ 20, 66 N.E.3d 848 (quoting *People v. Studley*, 259 Ill. App. 3d 556, 559, 631 N.E.2d 839 (1994)).

¶ 67    Our determination the Act does not prescribe an absolute liability crime does not,

however, end our analysis. Specifically, we must still decide whether the State was required to prove a mental state pertaining to the revocation of defendant's FOID card. As previously noted, section 4-3(a) of the Criminal Code provides: "A person is not guilty of an offense, other than an offense which involves absolute liability, unless, with respect to each element described by the statute defining the offense, he acts while having one of the mental states described in Sections 4-4 through 4-7." 720 ILCS 5/4-3(a) (West 2018).

¶ 68    Although stressed in the context of her absolute liability argument, defendant claims she could not be convicted of violating the Act unless the State proved she was aware or should have been aware her FOID card was revoked. Moreover, as we previously noted, defendant argues the trial court erred by granting the State's motion *in limine* barring defendant from testifying she did not know her FOID card was revoked.

¶ 69    The State asserts defendant forfeited any challenge to the trial court's ruling on the motion *in limine*. According to the State, defendant did not make an offer of proof, which was necessary to present the court with facts supporting her claim she was unaware of the revocation, nor did she present any authority to support her contention of a *mens rea* requirement. The State further notes defendant does not contend her FOID card was not properly revoked.

¶ 70    Whether proof of a mental element pertaining to a revocation is required under the Act appears to be a matter of first impression. The parties have not cited, and we have not found, any published Illinois case addressing the issue presented. However, we believe the First District's opinion in *People v. Stanley*, 397 Ill. App. 3d 598, 921 N.E.2d 445 (2009), is instructive. In *Stanley*, the First District examined section 24-5(b) of the Criminal Code of 1961 (720 ILCS 5/24-5(b) (West 2006)), which provides: "A person who possesses any firearm upon which any such importer's or manufacturer's serial number has been changed, altered, removed or obliterated

- 24 -

commits a Class 3 felony." *Stanley*, 397 Ill. App. 3d at 605.

¶ 71        The defendant in *Stanley* argued the State failed to prove him guilty of the offense

because there was no proof of his knowledge "the marks had been scratched off" of the shotgun

he possessed. *Stanley*, 397 Ill. App. 3d at 603. Alternatively, the defendant argued the statute was

constitutionally infirm because it did not require proof of a culpable mental state, thereby imposing

absolute liability tending to criminalize innocent conduct. *Stanley*, 397 Ill. App. 3d at 603.

¶ 72        The *Stanley* court began its analysis by noting the statute at issue (like the statute

at issue in the instant case) made no reference to a *mens rea* requirement. Accordingly, the court

examined the statutory guidelines found in section 4-3 of the Criminal Code of 1961 (720 ILC 5/4-

3 (West 2006)). We note section 4-3 has not changed since *Stanley* was decided.

¶ 73        The First District found section 24-5(b) of the Criminal Code of 1961 (720 ILCS

5/24-5(b) (West 2006)) did not create an absolute liability offense because it required defendant's

knowing possession of the firearm. *Stanley*, 397 Ill. App. 3d at 607. The court then proceeded to

determine whether "the knowing mental state applies to the possession of the defaced firearm or

knowledge of the defacement." *Stanley*, 397 Ill. App. 3d at 607. The court ultimately concluded

the knowledge requirement of the statute applied only to the possessory component of the offense.

*Stanley*, 397 Ill. App. 3d at 608. In doing so, the court stated:

> "[W]e discern that the elements of this offense are properly the *mens rea* and the
>
> possession, that is, the State must prove the knowing possession of the defaced
>
> firearm by defendant. The State, however, need not prove knowledge of the
>
> character of the firearm. Though the defacement unmistakably bears upon the
>
> commission of the offense, it is not an element of the offense." *Stanley*, 397 Ill.
>
> App. 3d at 609.

¶ 74 In our case, we similarly find the State did not need to prove defendant either knew or was recklessly unaware her FOID card had been revoked. Although the revocation unmistakably bears upon the commission of the offense, it is not an element requiring proof of a separate, additional mental state.

¶ 75 We further note the *Stanley* court was significantly persuaded by the analysis in *People v. Ivy*, 133 Ill. App. 3d 647, 479 N.E.2d 399 (1985). In *Ivy*, the defendant challenged her conviction for possession of a sawed-off shotgun, arguing the State failed to prove she was aware of the character of the firearm. *Ivy*, 133 Ill. App. 3d at 652. The *Ivy* court determined "it was sufficient for the defendant's conviction that she have knowledge that she possessed the gun in question, which, because of its dangerous capacity, was the subject of legislative enactment." *Ivy*, 133 Ill. App. 3d at 653.

¶ 76 It seems apparent the dangerous capacity of firearms in the possession of persons unqualified to possess or acquire them was the subject of the legislative enactment at issue in the present case. Accordingly, we conclude the State was not required to prove beyond a reasonable doubt defendant knew or was recklessly unaware her FOID card was revoked for her to be found guilty under the Act.

¶ 77 We recognize the firearms in *Stanley* and *Ivy* were deemed illegal to possess, whereas the firearm possessed by defendant was not itself an illegal weapon. However, we do not believe that distinction invalidates our analysis pertaining to defendant's knowledge of the status of her FOID card.

¶ 78 In *Laws*, this court addressed section 120(a) of the Methamphetamine Control and Community Protection Act (Methamphetamine Act) (720 ILCS 646/120(a) (West 2012)). *Laws*, 2016 IL App (4th) 140995, ¶ 1. Section 120(a) states:

"Whenever any person *** is found guilty of *** an offense under this Act *** no such person shall thereafter knowingly *** possess any substance or product containing a methamphetamine precursor *** without the methamphetamine precursor first being prescribed for the use of that person ***." 720 ILCS 646/120(a) (West 2012).

¶ 79          In *Laws*, the defendant purchased Sudafed without a prescription after being convicted under the Methamphetamine Act. Because Sudafed contains pseudoephedrine, a methamphetamine precursor, defendant was charged and found guilty of violating section 120(a) of the Methamphetamine Act, a Class 4 felony. *Laws*, 2016 IL App (4th) 140995, ¶ 3. On appeal, the defendant argued the proper construction of the statute required the State to show he both knew he possessed Sudafed and knew the Sudafed contained a methamphetamine precursor. *Laws*, 2016 IL App (4th) 140995, ¶ 20. The State argued the statute required it to prove defendant knowingly possessed the Sudafed but did not require proof defendant knew the Sudafed contained a methamphetamine precursor. *Laws*, 2016 IL App (4th) 140995, ¶ 21.

¶ 80          This court ultimately agreed with the State and approved the reasoning and analyses of *Stanley* and *Ivy*. *Laws*, 2016 IL App (4th) 140995, ¶¶ 21-23. Thus, although the Sudafed was not an illegal substance, the defendant's status prohibited him from possessing it. Similarly, although defendant's firearm in our case is not an illegal weapon, the revocation of defendant's FOID card prohibited defendant from possessing the firearm. Accordingly, we do not find the illegal character of the firearms in *Stanley* and *Ivy* to have any bearing on the knowledge element at issue here.

¶ 81          As a final observation on this issue, we note section 14(c)(1) of the Act provides that it is a Class 3 felony if a person's FOID Card is revoked or *subject to revocation under Section*

*8*. 430 ILCS 65/14(c)(1) (West 2018). The language emphasized appears to authorize a Class 3 felony conviction of a person whose FOID card is not actually revoked but only subject to revocation. Presumably, this is so because a person who has lawfully obtained a FOID card under the Act would be expected to have notice of the Act's provisions, including those in section 8, which render a person ineligible to possess a FOID card. See 430 ILCS 65/8 (West 2018); see also 720 ILCS 5/4-3(c) (West 2018) ("Knowledge that certain conduct constitutes an offense, or knowledge of the existence, meaning, or application of the statute defining an offense, is not an element of the offense unless the statute clearly defines it as such."). Thus, if possessing a firearm by a person whose FOID card is merely subject to revocation constitutes a violation of the Act, then a person's lack of knowledge of a revocation would be irrelevant.

¶ 82        In light of the foregoing, we do not find defendant established the trial court committed a "clear or obvious error" in its interpretation of the statute or in allowing the State's motion *in limine*. As a result, we will not proceed further with the plain-error analysis.

¶ 83                                III. CONCLUSION

¶ 84        For the reasons stated, we affirm the trial court's judgment.

¶ 85        Affirmed.

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Woodford County, No. 19-CF-114; the Hon. Charles M. Feeney III, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Gregory G. Peterson, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Gregory Minger, State's Attorney, of Eureka (Patrick Delfino, David J. Robinson, and Kim Noffke, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |